[No. D057485. Fourth Dist., Div. One. Dec. 11, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD EUGENE THOMAS et al., Defendants and Appellants.

**COUNSEL**

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant Edward Eugene Thomas.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant Dejon Satterwhite.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons and Julie L. Garland, Assistant Attorneys General, William M. Wood, Barry Carlton and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**NARES, Acting P. J.**—In this gang-related murder case, an amended information charged Edward Eugene Thomas and Dejon Satterwhite (together defendants), who are half brothers, each with seven offenses: two counts of murder (counts 1 & 7; Pen. Code, § 187, subd. (a) (statutory references will be to the Penal Code unless otherwise specified)) for the murders of Lee Smith (count 1) and Richard Wilson (count 7); three counts of attempted premeditated and deliberate murder (counts 2, 4 & 6; §§ 664, 187, subd. (a)) for the attempted murders of Charles Foster (count 2), Christopher Scott

(count 4), and Michael Canty (count 6); and two counts of shooting at an occupied motor vehicle (counts 3 & 5; § 246).

As to the two murder counts, the amended information alleged two special circumstances: (1) the murders were intentional and perpetrated by means of discharging a firearm from a motor vehicle (§ 190.2, subd. (a)(21)) and (2) defendants were each convicted in this proceeding of more than one murder (§ 190.2, subd. (a)(3)).

As to all seven counts, it was alleged that (1) defendants were principals and a principal personally used and discharged a firearm (§ 12022.53, subds. (b), (c), (e)(1)); (2) they were 14 years of age or older and committed offenses which, if committed by an adult, would be punishable by death or a life term in prison (Welf. & Inst. Code, § 707, subd. (d)(2)(A)); and (3) they committed the crimes for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)).

As to counts 1 through 5, it was alleged that defendants were principals and a principal personally used a firearm and proximately caused great bodily injury or death to a person other than an accomplice (§ 12022.53, subds. (d), (e)(1)).

As to counts 2, 4, and 6, it was also alleged that defendants personally inflicted great bodily injury (§ 12022.7, subd. (a)).

Following a joint trial with separate juries, Thomas's jury found him guilty of all seven counts, found the murders to be of the first degree and found the attempted murders to be premeditated and deliberate. The jury found true the enhancement allegations with the exception of (1) the allegations in the attempted murders of Charles Foster and Michael Canty that he was a principal and a principal personally used a firearm and proximately caused great bodily injury or death to a person other than an accomplice, and (2) the allegation in the shooting at an occupied motor vehicle charge that he was a principal and a principal personally used a firearm and proximately caused great bodily injury or death to a person other than an accomplice. Thomas's jury also found true as to both murder counts the special circumstance allegations that (1) the murders were intentional and perpetrated by means of discharging a firearm from a motor vehicle and (2) he was convicted in this proceeding of more than one murder.

Satterwhite's jury similarly found him guilty of all seven counts, found the murders to be of the first degree, and found the attempted murders to be premeditated and deliberate. The jury found true all of the enhancement allegations and, as to both murder counts, the special circumstance allegations

that the murders were intentional and perpetrated by means of discharging a firearm from a motor vehicle, and that he was convicted in this proceeding of more than one murder.

The court sentenced Thomas to a prison term consisting of two life terms without possibility of parole, plus 96 years to life, plus 40 years. The court sentenced Satterwhite to a total prison term of 196 years to life.

Thomas appealed, contending (1) the court prejudicially erred in admitting his postarrest statements to the police because the statements were involuntary under the totality of the circumstances; (2) the sentences for three enhancements of which he was acquitted were erroneously imposed and stayed, as reflected in the sentencing minutes and abstract of judgment, and should be stricken; and (3) Thomas's abstract of judgment should be corrected to show Satterwhite is jointly and severally liable for victim restitution.

The Attorney General concedes the three enhancement sentences Thomas claims are erroneous should be stricken, and the claimed error in Thomas's abstract of judgment should be corrected.

Satterwhite separately appealed, contending (1) his convictions must be reversed because the court erroneously permitted the prosecution to present evidence of statements he made during a custodial interrogation after he invoked his right to remain silent; (2) his convictions must be reversed because his admissions during interrogation were not freely and voluntarily made due to the conduct of the detectives and because he was "mentally retarded" and suffered from attention deficit disorder; (3) his sentence, which he asserts will "require [him] to serve at least 196 years in prison before he is eligible for parole," violates the federal and state constitutional proscriptions against cruel and unusual punishment; and (4) the sentencing minute order and the abstract of judgment must be corrected because (a) the minute order incorrectly indicates his sentence was a stipulated sentence and (b) the abstract incorrectly shows he was ordered to pay a $154 fine "PER GC2955001," which we construe to be a reference to Government Code section 29550.1 (discussed, *post*).

The Attorney General conceded Satterwhite's abstract of judgment erroneously indicated his sentence was stipulated, and thus it should be corrected.

In an unpublished opinion filed on August 16, 2012, we reversed the three sentence enhancements that Thomas contests and affirmed his judgment as so modified. We affirmed Satterwhite's judgment. We also remanded the matters with directions.

*Satterwhite's Petition for Rehearing*

By order dated September 14, 2012, we granted Satterwhite's opposed petition for rehearing,[1] in which he argued his sentence of 196 years to life should be reversed and the matter should be remanded for further proceedings in light of the United States Supreme Court's recent decision in *Miller v. Alabama* (2012) 567 U.S. ___ [183 L.Ed.2d 407, 132 S.Ct. 2455] (*Miller*), which held that the imposition of a *mandatory* sentence of life without the possibility of parole on a juvenile offender convicted of a homicide offense violates the prohibition of cruel and unusual punishment set forth in the Eighth Amendment to the United States Constitution. (*Miller*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469].)

For reasons we shall discuss, we affirm Satterwhite's convictions but vacate his sentence and remand his case for resentencing in light of *Miller*. We again reverse the three sentence enhancements that Thomas contests and affirm his judgment as so modified.

## FACTUAL BACKGROUND

A. *The People's Case*

1. *August 13, 2004 (11:30 p.m.) Gribble Street driveby shooting (victim: Charles Foster)*

In the afternoon on Friday, August 13, 2004, Charles Foster, a member of a gang known as "Skyline" or "Eastside Piru," approached a gas station in an area associated with the Skyline gang while walking to the home of Darrell Flynt, also a Skyline gang member, on Gribble Street. Foster noticed a white Expedition sport utility vehicle pull into a driveway behind him. The driver was a Black male teenager. A second Black male teenager in the driver's side passenger seat spoke through the open window and asked Foster, who was six or seven feet away, where he was from, a question Foster recognized as a challenge in gang culture to claim his gang.

When Foster replied he was from Skyline Piru, the passenger started making gang signs for the rival Lincoln Park street gang.[2] Foster testified he considered that action to be an act of disrespect and demanded that the passenger get out of the Expedition and fight. The passenger said it was not time yet and they would be back. The Expedition then drove away.

---

[1] Thomas did not file a petition for rehearing and did not join Satterwhite's petition.

[2] Lincoln Park Bloods were allied with the 5/9 Brims, and both gangs were rivals of the Skyline Pirus and their ally, O'Farrell Park.

Foster testified he walked to the gas station where he told some friends about the incident and told them to watch out for a white Expedition. Several hours later, Foster went to Flynt's house on Gribble Street.

At around 11:30 that night, Foster, Flynt, and several other people were out in front of Flynt's house. One of them yelled, "white Expedition," and Foster and everyone started running. Foster recognized the Expedition from the confrontation earlier that day. Several witnesses testified that the occupants of the Expedition began shooting at the people in front of Flynt's house.

Arthur Zieglar testified the shooting started after a Lincoln Park gang sign was thrown out through the driver's side passenger window of the Expedition.

Rosalie Wilkerson testified she saw two Black males firing through the open windows from the front and rear of the passenger side of the Expedition and another fired over the top of the vehicle from the rear driver's side. The back passenger on the passenger side had half his body outside the window as he fired, and he was wearing a hat that fell off onto the street. The front passenger fired a handgun.

Foster testified that as he ran toward Flynt's open garage door, he heard "a few" gunshots, felt a sting in his left leg, and fell to the pavement. He had been shot near his ankle.

A baseball cap was recovered in the middle of the street, as well as four .380-caliber shell casings and six .22-caliber shell casings. Analysis of the DNA recovered from the cap identified Robert Myers as the likely source.

Flynt testified that sometime later he encountered Thomas when Flynt was in juvenile custody. Flynt confronted Thomas about "shooting up" his house. Thomas replied, "There ain't no hard feelings. That's part of the game."

2. *August 14, 2004 (12:30 a.m.) car-to-cars shootings on southbound Highway 163 (victims: Richard Wilson, Christopher Scott, Michael Canty)*

In the early morning hours shortly after midnight on Saturday, August 14, 2004, several friends were driving in a caravan looking for something to do. Richard Wilson was driving his silver BMW with Christopher Scott as his passenger. Marcus Whitfield was driving a black Lexus with Kenny McKnight as a passenger. Michael Canty, who was alone, was driving a black Mustang. Canty was a "shot caller" associated with the O'Farrell Park gang, an ally of the Skyline Pirus.

The caravan arrived at a club off Highway 163 in Linda Vista. They went there to attend a party. Wilson and Scott went inside to check out what was going on. Canty, who stayed outside, noticed a white Expedition parked in the back of the parking lot. Two Black males were standing next to the Expedition playing music associated with the Lincoln Park gang.

When Wilson and Scott returned, the group decided to drive downtown to find something to do. When they got back into the cars and left the club, they were in the same cars in which they had arrived. When the caravan drove onto southbound Highway 163, Whitfield's Lexus was first in line, Wilson's BMW was second, and Canty's Mustang was last. Canty noticed that the white Expedition followed them out of the parking lot and onto the freeway.

Canty testified that as he proceeded down the freeway into Mission Valley, shots were fired at him and he heard glass breaking. Canty suffered two gunshot wounds to his right forearm.

Scott, who was in Wilson's BMW ahead of Canty's Mustang, heard a loud noise and turned down the radio. The back window of the BMW then burst and Scott heard gunshots. When Scott got back up after ducking down, Wilson was slumped over toward the passenger seat and the car was accelerating. Scott steered the car into the guardrail on the left side of the freeway and the car eventually stopped. Wilson died from a gunshot to the head. Scott was shot twice, in the left shoulder and in the back.

 3. *August 14, 2004 (9:00 p.m.) driveby shooting at Meadowbrook Drive and Skyline Drive (victim: Lee Smith)*

Also on Saturday, August 14, Alfred Lacy, Lee Smith, and others walked to the bus stop near the intersection of Meadowbrook Drive and Skyline Drive after playing basketball. Shortly after 9:00 p.m., while waiting at the bus stop, Lacy saw a white Expedition on Meadowbrook Drive at the stoplight on Skyline Drive. That area is a well-known Skyline Piru hangout. Lacy testified the Expedition caught his attention because "there [were] a lot of rumors about the white Expedition." When the light changed and the Expedition drove down Meadowbrook Drive past the bus stop, Lacy saw two Black males in the front seats. The Expedition was driving slowly—about 20 to 25 miles per hour—and the two Black males were "mad dogging" (or staring in a negative way at) Lacy and his friends.

The Expedition continued down Meadowbrook Drive and then returned a few minutes later on Lacy's side of the street. Lacy testified he saw one of the Black males sitting on the window frame of the driver's door, aiming something across the roof of the car at Lacy's group at the bus stop as the

Expedition slowly drove by about 15 feet away. Although Lacy did not see a gun, the male's hands were clasped with fingers together and his elbows were on the roof.

Lacy testified he dove to the ground and heard a gunshot. Soon thereafter, Lacy found Smith lying on the ground and yelling that he was hit. Smith died later that night from a gunshot wound. At trial, Lacy identified Thomas as the person he saw shooting across the top of the Expedition.

### 4. *The arrests*

Jimmine Johnson, who was then 15 years of age, dated Thomas for a few months in 2004, but they were just friends by August of that year. In her opinion, Thomas was associated with the 5/9 Brims gang, a Blood gang, because of the slang language he used, his references to the 5/9 Brims, the burgundy-colored clothes he wore, and his refusal to leave his car at a birthday party due to the presence of Skyline gang members. Johnson testified that Satterwhite used similar language.

In front of Thomas's jury only, Johnson testified that Thomas called her on Saturday morning, August 14, and asked her to look in the newspaper to see if there was anything about a shooting on a freeway. When she told Thomas she had found nothing, he asked her to get a different newspaper and check again. Johnson again found nothing.

Johnson testified before both juries that she was at Kendra Brown's house that night planning on attending a party. At 9:25 p.m., Thomas called Johnson and said he was in front of Brown's house. Thomas was driving his white Ford Expedition and Satterwhite was sitting in the backseat behind Thomas. Two other Black males dressed in red were inside the Expedition: Ivory Harris was in the front passenger seat and Robert Myers was seated behind Harris. Johnson and Brown sat between Satterwhite and Myers in the rear passenger area.

Brown testified she saw a rifle on the floor and was frightened, but Satterwhite told her, "Don't worry about it." Brown also stated the front passenger (Harris) waved a handgun in Thomas's face, apparently joking around, and Thomas seemed mad about that behavior.

Soon thereafter, Harris frantically said there was a police car behind them. Johnson testified the police car's overhead light and siren were not on. Harris passed the handgun back to Myers, who was sitting to the right of Johnson and wearing a red-hooded sweatshirt.

Satterwhite was frantically telling Thomas to stop the car. Thomas kept driving and, a couple of minutes later, turned into an apartment complex parking lot. Johnson testified that before the Expedition came to a stop, Satterwhite opened his door and ran off. Johnson's testimony indicated that Myers, who was holding a bottle of alcohol, put the handgun under the right rear passenger seat before he got out.

At around 9:37 p.m. that night, San Diego Police Officer Paul Keffer received a radio call about a shooting on Meadowbrook Drive. He spotted a white Expedition that matched the description he had been given of the suspect vehicle. Officer Keffer recognized the description as that of a vehicle involved in the Gribble Street shooting the night before. He followed the Expedition into an apartment complex and saw a Black male in his teens or 20's (Satterwhite) get out of the driver's side and run before the Expedition came to a stop. Officer Keffer stopped the right front passenger (Harris) at gunpoint after the passenger got out and started to walk away. Additional police officers arrived and took Thomas, Myers, Johnson, and Brown into custody.

Under the right rear passenger seat where Myers had been sitting, the police recovered a nine-millimeter Ruger semiautomatic handgun, a .22-caliber semiautomatic rifle, a pair of gloves, and a box of nine-millimeter ammunition. A red baseball cap and a root beer can were recovered inside the Expedition. Several latent fingerprints from the root beer can matched those of Satterwhite. Satterwhite was also matched to three latent fingerprints from the window and frame of the rear driver's side. Satterwhite's DNA matched the major contributor of DNA from the red baseball cap with a statistical probability of one in hundreds of billions, while Thomas, Harris, and Myers were excluded.

Lacy was transported to the apartment complex, where he identified the Expedition and also identified Thomas as the shooter. Lacy also identified Myers as having been inside the Expedition at the time of the shooting.

5. *Additional evidence*

a. *Gribble Street*

A baseball cap was recovered from the middle of Gribble Street, along with four .380-caliber shell casings and six .22-caliber shell casings. DNA testing of the baseball cap sweatband yielded a mixture of at least three donors, with Myers's DNA matching the predominant DNA. The others in the Expedition were excluded. The four .380-caliber shell casings were fired from the same gun. All of the .22-caliber shell casings were fired from the .22-caliber rifle recovered from Thomas's Expedition.

### b. *Highway 163*

Three nine-millimeter shell casings were found on Highway 163 about 2,200 feet north of where the BMW stopped. All three were fired from the nine-millimeter Ruger handgun recovered from Thomas's Expedition.

Several bullets were recovered from the Mustang. All were nine-millimeter and four were identified as having been fired from the nine-millimeter Ruger handgun recovered from Thomas's Expedition.

### c. *Meadowbrook Drive*

The police found a .380-caliber bullet casing on Meadowbrook Drive in front of the bus stop. The casing was fired from the same gun that fired the four .380-caliber casings recovered at the Gribble Street shooting scene.

### d. *Satterwhite's admission*

Satterwhite said to Johnson and Rayshawn Jefferson in a phone call, "I can't believe my brother is going to go down for something that I did." Satterwhite also said that, when he ran, he went to a friend's house.

### e. *Thomas's August 15, 2004 postarrest statement*

Early in the morning on Sunday, August 15, 2004, following his arrest, Thomas was interviewed by Detectives Ernie Encinas and Raul Delgadillo. The interview was videotaped (the DVD copy of which was marked as exhibit No. 106) and played for Thomas's jury only. The interview began at 4:30 a.m., and Thomas was the last of the five people taken into custody (Harris, Thomas, Myers, Johnson, and Brown) to be questioned by the police.

Thomas acknowledged the white Expedition was his car; it was registered in his stepfather's name. Thomas eventually acknowledged he and his half brother, Satterwhite, were members of the 5/9 Brims gang. Myers was also a member of the 5/9 Brims gang.

Thomas told the detectives he was at a party Friday night (Aug. 13) with his friend Damien, who was a Lincoln Park gang member, Myers, and Satterwhite until 11:22 p.m. when members of the Lincoln Park and Skyline gangs got into a fight and the party was shut down. He said Damien wanted to go to Gribble Street to find someone from Skyline to fight.

Thomas told different versions of events in which he, then Myers, and then Damien drove the Expedition to Gribble Street. In one version, Thomas said

Myers was driving, Damien was in the front passenger seat, Thomas was behind Damien, and Satterwhite was behind Myers. Damien started shooting the nine-millimeter Ruger handgun, Thomas shot the .22-caliber rifle into "the crowd," and Satterwhite fired a single shot from the .380-caliber handgun. Thomas said Damien fired 10 shots and he (Thomas) fired three shots and then the rifle jammed.

In another version, Thomas told the detectives that Damien was driving, Thomas was in the front passenger seat with the rifle, Myers was sitting behind him, and Satterwhite was behind Damien. Thomas fired the rifle out the window three times before it jammed, Myers fired the nine-millimeter Ruger handgun eight to 10 times, and Satterwhite leaned out the rear driver's side window and fired one shot from the .380-caliber handgun over the roof. Thomas stated he shot into the crowd because they were from Skyline and he was from Brims, and "[i]t was like I was doing what I was supposed to do or something." During the incident Myers lost a hat with an "SD" on it. Thomas stated it was his intention to hit someone when he fired the rifle during the shooting incident on Gribble Street.

Thomas said that after the shooting on Gribble Street, they got on the freeway and between midnight and 1:00 a.m. drove to a party at a club in Linda Vista. They sat in the parking lot where they spoke to some girls and saw some Skyline gang members in a Mustang and a BMW. Thomas believed the Skyline gang members had previously shot at them. When the Skyline gang members drove away in three cars—the Mustang, the BMW, and a luxury car—Damien drove the Expedition and followed the cars out of the parking lot, through a U-turn, and onto southbound Highway 163. Thomas said he was in the front passenger seat, Myers was behind him, and Satterwhite was behind Damien. Driving in the fast lane, not the "very fast lane," they drove alongside the Mustang, Thomas tried to fire the rifle at it but the safety was on, and Myers fired eight rounds at the Mustang with the nine-millimeter Ruger handgun. When the Mustang pulled over to the side of the freeway, the Expedition sped up, pulled alongside the luxury car, and Thomas fired the rifle at it three times. Myers's nine-millimeter Ruger handgun jammed. Thomas told the detectives he shot out the back window of the luxury car. They then sped up and eventually went home. Thomas indicated he called Johnson the next morning and asked her to look in the newspaper for reports on the shooting, but she found nothing.

Thomas told the detectives he was with Harris, Myers, and Satterwhite that night, and they got into a fight with Skyline gang members and were heckled by Skyline gang members during a traffic stop. They then retrieved some hidden guns and drove to Meadowbrook Drive in the Expedition. Thomas was driving, Harris was in the front passenger seat, Myers was behind Harris,

and Satterwhite was behind Thomas. Thomas said he drove by a group of 10 to 15 Skyline gang members and then turned around. The Skyline members said, "What's up, Ru?," indicating they were associated with Skyline Piru. Harris said, "I'm gonna bust." Thomas indicated to the detectives that Harris, Myers, and Satterwhite all pointed guns at the group of Skyline gang members as they were walking away from a bus stop, but he was only sure Harris actually fired at them with the nine-millimeter Ruger handgun. Harris fired one shot. Thomas said there were only three guns in the Expedition and denied having a gun. Myers had the .22-caliber rifle. Satterwhite had the .380-caliber handgun. Thomas also said Satterwhite "[c]ould have" leaned over the roof of the Expedition with the handgun, but stated, "I don't think so." Thomas said he did not know if Satterwhite fired the gun. Thomas said he drove "to get the girls." Satterwhite ran when the police stopped the Expedition.

### f. *Thomas's recorded post interview conversation with Harris*

Following his interview, Thomas was placed in the back of a patrol car that was parked in the police department sally port next to a patrol car in which Harris and Myers were being held. The open back windows of the vehicles faced each other and the recording devices in the vehicles were activated. The recorded conversation between Thomas and Harris (exhibit No. 107) was played for Thomas's jury.

Thomas told Harris that he (Thomas) told the police he was the shooter after the police told him the incident on southbound Highway 163 had been videotaped.[3] Thomas admitted to Harris he (Thomas) "was in [the interview] for so long 'cause I kept lying."

### g. *Search of Thomas and Satterwhite's residence and Satterwhite's arrest*

After Thomas's interview, a search warrant was executed at Thomas and Satterwhite's residence. A shoe box with gang writing and tagging, as well as a composition book, was found in an upstairs bedroom. The writing on the shoe box had numerous references to the 5/9 Brims and Lincoln Park gangs, as well as references to rivalry, hatred, and disrespect for the Crips, Skyline Piru, and O'Farrell gangs. The composition book, which was titled "book of rhymes" and had Thomas's name on it, was filled with gang-related writing

---

[3] The record shows that when Thomas falsely stated during his interview that he was not in the Expedition during the shooting incident on southbound Highway 163, Detective Encinas lied to Thomas, in order to get him to tell the truth, by telling Thomas the incident was recorded by cameras on the freeway that were similar to cameras at red lights.

showing affiliation with the 5/9 Brims gang, and also showing rivalry and hatred toward the Skyline and O'Farrell gangs. Satterwhite, who was at the residence, was arrested.

### h. *Satterwhite's postarrest statement*

A videotape recording of Satterwhite's August 14, 2004 police interview (exhibit No. 100) was played for Satterwhite's jury only. Satterwhite admitted he was in the Expedition during all three shooting incidents. Specifically, he admitted that "we" drove to Gribble Street because Damien wanted to fight a Skyline gang member. After denying he threw a gang sign from the Expedition, Satterwhite eventually admitted his window was down and he threw a 5/9 Brims gang sign. He said Damien began firing the rifle.

Satterwhite also said they saw a Skyline gang member at the club in Linda Vista and a group of cars followed them onto Highway 163 and chased them. He said Damien fired the rifle into the air and Myers fired the nine-millimeter Ruger handgun.

Satterwhite also said they were on the way to Paradise Hills when they made a U-turn on Meadowbrook Drive and went back to fight. He said they were shot at and Myers then shot once in the air. Satterwhite admitted he also had a gun and fired once in the air.

### i. *Gang expert testimony*

San Diego Police Detective Jack Schaeffer of the street gangs unit testified as a gang expert. The 5/9 Brims gang is a criminal street gang that had about 100 members in 2004. It claimed territory and had hand signs, colors, allies, and rivals. The gang's primary activities are homicides, driveby shootings, felony assaults, armed robbery, drug dealing, and pimping.

Detective Schaeffer opined that the members of the 5/9 Brims gang engaged in a pattern of criminal activity, and he described two crimes in support of his opinion: a murder on May 4, 2004, and an earlier murder on June 18, 2003. He described how respect from being feared is the most important aspect of gang life and testified that respect is earned and increased by gang members' commission of acts of violence on behalf of the gang, and respect is increased when the acts of violence are known by others.

Testifying before Thomas's jury only, Detective Schaeffer opined that Thomas was a member of the 5/9 Brims gang on the weekend of the shootings involved in this case. He opined the three shootings benefited the 5/9 Brims gang, were committed in association with the 5/9 Brims gang, and

were performed for the benefit of the 5/9 Brims gang with the intent to promote, further, and assist the criminal activity of the gang. He explained that the Gribble Street shooting increased the status of and respect for the perpetrators and the gang because the shooting took place in rival Skyline territory. The Highway 163 shooting similarly increased respect for the perpetrators and their gang because the ·targets were known rival gang members. The Meadowbrook Drive shooting also increased respect for the perpetrators and their gang because it occurred in Skyline territory and the intended victims would have been perceived as rival gang members.

Testifying before Satterwhite's jury only, Detective Schaeffer opined that Satterwhite was a member of the 5/9 Brims gang on the weekend of the same shootings. He again opined that the shootings promoted, furthered, or assisted the criminal conduct of the gang members.

B. *The Defense Cases*

1. *Before Thomas's jury only*

Testifying before Thomas's jury only, Jeff Victoroff, M.D., a physician practicing in the areas of behavioral neurology and neuropsychiatry, testified after reviewing Thomas's medical and school records that Thomas suffered a 40-foot fall at age 12 that resulted in a concussion, a skull fracture, and mild traumatic brain injury. He opined that Thomas could have suffered permanent brain injury based on a mildly abnormal neurological examination and a CT scan that indicated damage to the right frontal lobe. Such an injury could cause reduced inhibitions and a lowered ability to anticipate consequences. Thomas's IQ of 78 was "borderline mental retardation."

2. *Before Satterwhite's jury only*

Satterwhite presented, to his jury only, the expert testimony (discussed, *post*) of (1) Rahn Minagawa, a clinical and forensic psychologist, who evaluated Satterwhite in 2006 and (2) Meredith Friedman, a forensic psychologist, who evaluated Satterwhite in 2007.

DISCUSSION

I

*FINDING THAT SATTERWHITE DID NOT INVOKE HIS RIGHT TO SILENCE*

Satterwhite contends his convictions must be reversed because the court erroneously permitted the prosecution to present evidence of statements he

made during a custodial interrogation after he invoked his right to remain silent. We reject this contention.

A. *Background*

1. *Police interview*

Detectives Encinas and Francisco Ramirez interviewed Satterwhite after he was arrested. The interview was videotaped and a transcript was prepared. The videotape (exhibit No. 100) was played for Satterwhite's jury only.

Detective Encinas testified that he advised Satterwhite of his *Miranda*[4] rights. Satterwhite, who had previously been advised about *Miranda* rights, indicated he understood those rights, waived them, and agreed to answer the detectives' questions.

Satterwhite repeatedly denied any involvement in the shooting incidents at issue in this case and claimed he was not present. Detective Encinas said, "No, you were there. Why would your brother . . . say you were there?" Satterwhite replied, *"Whatever. Well, I know I wasn't there."* (Italics added.) Detective Ramirez told Satterwhite, "[W]e've been working on this all night. Okay? Since we arrested your brother and his friends. Okay?" However, Satterwhite continued to claim, "I know I wasn't there."

Detective Ramirez then told Satterwhite he was hurting himself by lying. When Detective Encinas again accused Satterwhite of lying, Satterwhite retorted, *"How long do I have to stay here and deal with this bullshit?"* (Italics added.)

Detective Ramirez later told Satterwhite, "By you sitting here lying it just makes us think you're hiding something." When Detective Ramirez reiterated this point, Satterwhite replied, "Well, I know I wasn't [there]. *I ain't talking no more and we can leave it at that."* (Italics added.)

Detective Encinas then offered to play a recording of Thomas's statements to the police and asked Satterwhite, "You want to listen to your brother?" Satterwhite replied, "Go ahead," and Detective Encinas let Satterwhite listen to the recording.

Satterwhite thereafter continued answering the detectives' questions. Eventually, he made various admissions. For example, he indicated he and three others were in the Expedition on Gribble Street. Thomas was driving and

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

Satterwhite was sitting behind Thomas. Satterwhite admitted he threw a gang sign at the "Skyline guys." He told the detectives Thomas was driving during the freeway shooting, and he (Satterwhite) was sitting behind Thomas. Satterwhite also told the detectives he was in the car with Thomas, Harris, and Myers during the Meadowbrook Drive shooting; Thomas was driving and he (Satterwhite) was sitting behind Thomas. After repeatedly telling the detectives he did not know why his brother would say he fired a .380-caliber handgun, Satterwhite finally admitted he had the .380-caliber handgun, but said he only fired it one time, into the air, after they passed the Skyline guys on Meadowbrook Drive and after Myers fired his weapon. Satterwhite said he threw the handgun in a canyon in Paradise Hills.

### 2. *Satterwhite's motions to suppress evidence of his statements*

In October 2007 Satterwhite filed a motion to suppress his postarrest statements, claiming he invoked his right to silence under *Miranda* during the interrogation when he stated, "I ain't talking no more and we can leave it at that."[5] At the hearing on the motion, the court indicated it had read Satterwhite's motion papers, viewed the videotape of the interview, and read the transcript. The court heard the testimony of Dr. Friedman regarding her evaluation of Satterwhite's mental status. The prosecutor argued that Satterwhite's purported invocation of the right to remain silent was a momentary expression of frustration. Following the hearing, the court denied the motion, finding that Satterwhite's statement was not a post-*Miranda* invocation of his right to remain silent.

The court revisited the issue in early October 2008. After viewing the videotape of the interview and relying on *People v. Jennings* (1988) 46 Cal.3d 963 [251 Cal.Rptr. 278, 760 P.2d 475], the court again found Satterwhite's statement—"I ain't talking no more. We can leave it at that."—was not an invocation of his right to remain silent. Commenting that it saw "casual conversation," not ruthless interrogation, the court stated, "It seemed like a frustrating moment at the time, which the defense calls an invocation of his right to remain silent." The court agreed with the prosecutor's observation that "[t]here is [*sic*] a lot of tones of frustration."

The court revisited the issue once again in November 2009, when Satterwhite raised it in his motions in limine. The court affirmed its prior rulings.

---

[5] As we shall discuss, *post*, Satterwhite's motion also sought suppression of "all admissions and confessions and other statements" he made to law enforcement "on the grounds that threats, promises, and coercions by the officers rendered [them] involuntary and inadmissible."

B. *Applicable Legal Principles*

■ The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." This provision applies to the states under the Fourteenth Amendment's due process clause. (*Malloy v. Hogan* (1964) 378 U.S. 1, 8 [12 L.Ed.2d 653, 84 S.Ct. 1489].)

To safeguard the federal constitutional right not to be compelled to be a witness against oneself at trial, a suspect in police custody "must be warned prior to any questioning that he has the right to remain silent [and] that anything he says can be used against him in a court of law." (*Miranda, supra,* 384 U.S. at p. 479.) A suspect may waive his right to remain silent; and, if he does so voluntarily, knowingly and intelligently, statements made during police interrogation may be used against him at trial. (*Maryland v. Shatzer* (2010) 559 U.S. 98, 103–104 [175 L.Ed.2d 1045, 130 S.Ct. 1213, 1219]; *Miranda,* at pp. 444, 478–479.)

■ If a suspect who waived his *Miranda* right to remain silent unambiguously and unequivocally indicates later during the interrogation that he wishes to remain silent, the interrogation must stop. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, \_\_\_–\_\_\_, \_\_\_–\_\_\_ [176 L.Ed.2d 1098, 130 S.Ct. 2250, 2259–2260, 2263–2264]; *Miranda,* 384 U.S. at pp. 473–474; *People v. Martinez* (2010) 47 Cal.4th 911, 947 [105 Cal.Rptr.3d 131, 224 P.3d 877].) A defendant, however, "may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.' " (*People v. Silva* (1988) 45 Cal.3d 604, 629–630 [247 Cal.Rptr. 573, 754 P.2d 1070].) To stop the questioning, the suspect "must articulate his desire to [remain silent] sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [an invocation of the right to remain silent]." (*Davis v. United States* (1994) 512 U.S. 452, 459 [129 L.Ed.2d 362, 114 S.Ct. 2350]; see *Berghuis, supra,* 560 U.S. at pp. \_\_\_–\_\_\_ [130 S.Ct. at pp. 2259–2260].)

A defendant has not unambiguously and unequivocally invoked his right to remain silent when his statements are merely expressions of passing frustration or animosity toward the interrogating officer or amount only to a refusal to discuss a particular subject. (*People v. Williams* (2010) 49 Cal.4th 405, 433 [111 Cal.Rptr.3d 589, 233 P.3d 1000] (*Williams*); see *People v. Jennings, supra,* 46 Cal.3d at pp. 977–978 [defendant's statements—" 'I'll tell you something right now. You're scaring the living shit out of me. I'm not going to talk. You have got the shit scared out of me,' " and, " 'I'm not saying shit to you no more, man. You, nothing personal man, but I don't like you. You're scaring the living shit out of me. . . . That's it. I shut up.' "—held to be a

momentary expression of anger toward the questioning officer, not an invocation of the right to remain silent].)

### 1. *Standard of review*

"In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith* (2007) 40 Cal.4th 483, 502 [54 Cal.Rptr.3d 245, 150 P.3d 1224].)

### C. *Analysis*

In our view, Satterwhite's statement to the detectives—"I ain't talking no more and we can leave it at that"—was not an unambiguous invocation of his right to remain silent; it was merely an expression of momentary frustration both with the detectives' failure to accept Satterwhite's repeated insistence that he was not present during the shootings and with Deputy Ramirez's immediately preceding statement that Satterwhite was "hiding something."

The transcript of the interview shows that Satterwhite had already repeatedly expressed frustration during the interview. Specifically, it shows that Detective Ramirez told Satterwhite, "You're hurting yourself by lying like that, man," and Satterwhite replied, "No I'm not hurting myself cuz I'm not lying." In response, Detective Encinas said, "We know you're lying, cuz not everybody in that car is gonna lie about it." Expressing clear frustration, Satterwhite immediately retorted, *"How long do I have to stay here and deal with this bullshit?"* (Italics added.)

Detective Encinas replied he wanted to get "[Satterwhite's] side of the story," and Satterwhite responded, "I just told you my statement." Detective Ramirez then told Satterwhite his statement was not truthful and asked for Satterwhite's side of the story about what happened on the freeway. Satterwhite answered, "I don't know what happened. That's what I'm saying." When Detective Ramirez replied, "[Y]our brother told us about the freeway," Satterwhite again expressed frustration, stating, *"Whatever."* (Italics added.)

The transcript shows that Satterwhite's frustration continued to mount. In a long statement, Detective Encinas indicated that Thomas had implicated Satterwhite, and Satterwhite responded, *"I don't care.* I know I wasn't there officer." (Italics added.) When Detective Encinas said, "We know you were there," Satterwhite challenged the detective, saying, *"Prove it."* (Italics added.)

Following another lengthy statement by Detective Encinas, Satterwhite asked, "So are we done talking?" Satterwhite then indicated he was going to stick with the same story he had given.

The interview continued. After the detectives asked Satterwhite about other matters, Detective Ramirez asked him why others would tell the detectives that Satterwhite "[was] there." Satterwhite again said, "I know I wasn't there."

Soon thereafter, Detective Ramirez again accused Satterwhite of lying, stating, "By you sitting here lying it just makes us think you're hiding something." When Detective Ramirez reiterated this point, Satterwhite made the statement he claims was an invocation of his right to remain silent: "Well, I know I wasn't [there]. *I ain't talking no more and we can leave it at that.*" (Italics added.)

When viewed in conjunction with his earlier expressions of frustration during the interview, this statement by Satterwhite to Detectives Encinas and Ramirez was another expression of momentary frustration and, at most, was an ambiguous invocation of the right to remain silent. As already discussed, the interrogation of a suspect who has waived his *Miranda* right to remain silent must stop if the suspect unambiguously and unequivocally indicates he wishes to remain silent. (*Berghuis v. Thompkins, supra,* 560 U.S. at pp. ___–___, ___–___ [130 S.Ct. at pp. 2259–2260, 2263–2264]; *Miranda, supra,* 384 U.S. at pp. 473–474.) Here, the record shows Satterwhite made no such invocation. Accordingly, we conclude the court properly denied Satterwhite's motions to suppress the admissions he made during the interview after he made the statement.

II

*VOLUNTARINESS OF THOMAS'S AND SATTERWHITE'S POSTARREST ADMISSIONS*

Both Thomas and Satterwhite contend the court erred by admitting evidence of their statements to the police because their statements were involuntary. We conclude Thomas and Satterwhite have failed to demonstrate their statements were involuntary.

A. *Applicable Legal Principles*

The federal and state Constitutions bar the use of involuntary confessions against a criminal defendant. (*Jackson v. Denno* (1964) 378 U.S. 368, 385–386 [12 L.Ed.2d 908, 84 S.Ct. 1774]; *People v. Benson* (1990) 52 Cal.3d

754, 778 [276 Cal.Rptr. 827, 802 P.2d 330].) A confession is involuntary if it is "not ' "the product of a rational intellect and a free will." ' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 398 [57 L.Ed.2d 290, 98 S.Ct. 2408]; see *People v. Cruz* (2008) 44 Cal.4th 636, 669 [80 Cal.Rptr.3d 126, 187 P.3d 970] ["The test for determining whether a confession is voluntary is whether the questioned suspect's 'will was overborne at the time he confessed.' "].)

Regarding the factors to be considered when determining whether a defendant's statements were voluntary (hereafter referred to as the *Dykes* factors), the California Supreme Court explained in *People v. Dykes* (2009) 46 Cal.4th 731, 752 [95 Cal.Rptr.3d 78, 209 P.3d 1] (*Dykes*) that courts examine whether a defendant's will was overborne by the circumstances surrounding the giving of a confession. "In making this determination, courts apply a 'totality of the circumstances' test [and look] at the nature of the interrogation and the circumstances relating to the particular defendant." (*Ibid.*) "With respect to the interrogation, among the factors to be considered are ' " 'the . . . element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; [and] its continuity'. . . .' ' " (*Ibid.*) "With respect to the defendant, the relevant factors are ' " 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " ' " (*Ibid.*)

The *Dykes* court also explained that " '[a] statement is involuntary [citation] when, among other circumstances, it "was ' "extracted by any sort of threats . . . [or] obtained by any direct or implied promises . . . ." ' " ' " (*Dykes, supra*, 46 Cal.4th at p. 752.) "A confession is 'obtained' by a promise within the proscription of both the federal and state due process guaranties if and only if inducement and statement are linked, as it were, by 'proximate' causation." (*People v. Benson, supra*, 52 Cal.3d at p. 778.) "The requisite causal connection between promise and confession must be more than 'but for': causation-in-fact is insufficient. [Citation.] 'If the test was whether a statement would have been made but for the law enforcement conduct, virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action.' " (*Id.* at pp. 778–779.)

### 1. *Standard of review*

"As with *Miranda* claims, the trial court's legal conclusion as to the voluntariness of a confession is subject to independent review on appeal. [Citations.] The trial court's resolution of disputed facts and inferences, its evaluation of credibility, and its findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence. [Citations.] The state bears the burden of proving the voluntariness of a confession by a preponderance of the evidence." (*Dykes, supra*, 46 Cal.4th at pp. 752–753.)

B. *Thomas's Claim His Statements Were Involuntary*

Thomas contends the court prejudicially erred in admitting his postarrest statements to the police because the statements were involuntary under the totality of the circumstances. We reject this contention.

1. *Background*

In November 2007 Thomas brought a pretrial motion to suppress his August 15, 2004 postarrest statements to the police (discussed, *ante*) on the ground the "admissions and confessions and other statements attributed to him" were involuntary. In early October 2008, following a hearing at which Detective Encinas testified, the court denied the motion, finding Thomas's statements were voluntary.

Thomas renewed his suppression motion in June 2009, and the motion was heard on December 9 of that year. The court indicated it had reviewed both the videotape of the interview and the transcript. Agreeing with the prosecutor that the interviewing officers advised Thomas of his *Miranda* rights and Thomas waived those rights, the court found that "the tone—the tone, which you can't get from a transcript, the tone of it was—on the part of the interrogators—was mellow and . . . nonthreatening, noncoercive."

It was stipulated that Thomas was arrested on August 14, 2004, at 9:46 p.m.; the interrogation at the San Diego Police Department's downtown San Diego headquarters began later, about 4:24 a.m., August 15, and the interview lasted a little more than four hours.

Detective Encinas testified that he and Detective Delgadillo interrogated Thomas for about four hours, and he acknowledged and explained various statements made during the interview as reflected in the transcript. Detective Encinas stated he was aware during the interview that Thomas was 17 years of age and indicated that Thomas was not handcuffed and was offered food and water.

On cross-examination, Detective Encinas acknowledged he was lying when he told Thomas, "We already know what happened." He also acknowledged this was an interrogation technique he often used with suspects to see if he could persuade them to provide information about their involvement in a criminal incident. Detective Encinas testified that neither he nor Detective Delgadillo yelled at Thomas or threatened him. He stated he told Thomas at certain points of the interview that he did not believe what Thomas was saying, and he did not make any promises to Thomas regarding leniency for giving a truthful statement.

Following the hearing, the court denied Thomas's renewed suppression motion. The court did not give any additional reasons for its ruling.

### 2. *Analysis*

In support of his claim that his postarrest admissions were involuntary, Thomas contends (1) his continuing detention during the interrogation beyond the six-hour time limit set forth in Welfare and Institutions Code section 207.1[6] was unlawful and (2) the totality of the circumstances created a coercive psychological situation rendering his admissions involuntary. These contentions are unavailing.

 We shall assume Thomas was detained for interrogation beyond the six-hour time limit set forth in Welfare and Institutions Code section 207.1. The parties stipulated he was arrested at 9:46 p.m. on August 14 and the four-hour interview began about 4:24 a.m. on August 15. However, Thomas acknowledges, as he must, that his detention beyond the six-hour statutory limit does not automatically require exclusion of his admissions if they were voluntary. "California has never adopted the *McNabb-Mallory*[7] rule that any confession obtained during an illegal detention is ipso facto inadmissible." (*In re Darren W.* (1981) 118 Cal.App.3d 969, 971–972 [173 Cal.Rptr. 711], citing *In re Michael E.* (1980) 112 Cal.App.3d 74, 79 [169 Cal.Rptr. 62]; see *Rogers v. Superior Court* (1955) 46 Cal.2d 3, 10 [291 P.2d 929].)

Thomas devotes 16 pages of his opening brief citing to the transcript of his interview and claiming the cited excerpts demonstrate his admissions were involuntary under the totality of the circumstances. For example, Thomas cites Detective Encinas's testimony that he lied to Thomas when he said, "We already know what happened." Thomas cites the statements of one of the detectives who, referring to the shooting on Highway 163, said, "When we ask you these questions we know the answer. I know the answer, right?," and, "You know something about it then. Then tell us what happened because we know." He complains the detectives used the lying technique again when they told him to be honest because there were cameras on the freeway that would show who was driving. Thomas concludes by asserting "[his] youth and sleepiness, the lateness of the hour, the extended, extra-legal detention at the

---

[6] Welfare and Institutions Code section 207.1, subdivision (d)(1)(B) provides: "(d)(1) A minor 14 years of age or older who is taken into temporary custody by a peace officer on the basis of being a person described by Section 602, and who, in the reasonable belief of the peace officer, presents a serious security risk of harm to self or others, may be securely detained in a law enforcement facility that contains a lockup for adults, if all of the following conditions are met: [¶] . . . [¶] (B) *The minor is detained in the law enforcement facility for a period that does not exceed six hours . . . .*" (Italics added.)

[7] *McNabb v. United States* (1943) 318 U.S. 332 [87 L.Ed. 819, 63 S.Ct. 608]; *Mallory v. United States* (1957) 354 U.S. 449 [1 L.Ed.2d 1479, 77 S.Ct. 1356].

police station, the length of the interrogation, the experience of the detectives and, most crucially, their techniques for creating psychological pressure that could manifestly only be relieved by the delivery of self-inculpating information—this totality of the circumstances constituted a coercive situation in which [his] statements were not voluntary."

After independently reviewing the transcript of the interview, considering the various *Dykes* factors, and assuming Thomas was detained for interrogation beyond the statutory six-hour time limit, we conclude Thomas has failed to establish under the totality of the circumstances that his will was overborne such that his admissions must be deemed involuntary. Although Thomas, who was 17 years old at the time of the interview, was young and he was questioned at the police station very early in the morning for about four hours by two experienced detectives, nothing in the record contradicts Detective Encinas's testimony that Thomas was not handcuffed, he was offered food and water, and the detectives did not threaten him, yell at him, or even raise their voices to him. The record thus supports the court's finding that the "tone . . . on the part of the interrogators . . . was mellow and . . . nonthreatening, noncoercive."

The record shows Thomas waived his *Miranda* rights. The California Supreme Court recently explained that *Miranda* "suggested that the advisements required by the opinion in that case would serve as a counterweight to the coercive pressure that may be exerted by" the use of such interrogation tactics as deception and a display of confidence in the suspect's guilt. (*Williams, supra*, 49 Cal.4th at pp. 442, 444.)

Thomas acknowledges "the detectives did not make an offer of leniency." The record shows that Thomas, like the defendant in *Williams*, "effectively parried the [detectives'] accusations and questions." (*Williams, supra*, 49 Cal.4th at p. 442.)

█ Detective Encinas's admitted interrogation techniques of lying to Thomas by telling him they knew the answers to the questions he and Detective Delgadillo were asking and of falsely telling Thomas there were cameras on Highway 163 that would show who was driving the Expedition do not compel a determination that Thomas's admissions were involuntary. The California Supreme Court has explained that "[l]ies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession, but they are not per se sufficient to make it involuntary." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240 [74 Cal.Rptr.2d 212, 954 P.2d 475].) "Rather, there must be a *proximate* causal connection between the deception or subterfuge and the confession." (*Ibid.*) Here, the detectives, like the officers in *Williams*, "presented defendant with incriminating evidence,

emphasized the seriousness of the charges, and urged [Thomas] not to lie, because lies would antagonize the court . . . ." (*Williams, supra,* 49 Cal.4th at p. 442.) We are persuaded the link between the detectives' use of the deceptive techniques and Thomas's numerous admissions "falls short of being 'proximate.' " (*Musselwhite, supra,* at p. 1241.) In sum, the court did not err by denying Thomas's unsupported suppression motion.

### C. *Satterwhite's Claim His Statements Were Involuntary*

Satterwhite contends his convictions must be reversed because his admissions during interrogation (discussed, *ante*) were not freely and voluntarily made due to the conduct of the detectives and because he was "mentally retarded" and suffered from attention deficit disorder. We reject this contention.

#### 1. *Background*

In his October 2007 suppression motion (discussed, *ante*), Satterwhite sought suppression of "all admissions and confessions and other statements" he made to law enforcement "on the grounds that threats, promises, and coercions by the officers rendered [them] involuntary and inadmissible."

In early December of that year, the court conducted a hearing on the motion during which Dr. Friedman testified. Dr. Friedman stated she tested Satterwhite in September 2007 and found he was functioning in the "mildly mentally retarded range," which means an IQ between 50 and 70. She also found he suffered from attention deficit and hyperactivity disorder (ADHD), which she described as a "developmental lag in the brain maturity." The court indicated it had viewed the two-hour videotape of Satterwhite's August 14, 2004 interview by two detectives and had also reviewed the transcript. The court denied the motion.

#### 2. *Analysis*

In support of his claim that his postarrest admissions were involuntary, Satterwhite contends "his statements during the interrogation clearly were the product of two coercive forces. First, the detectives' failure and refusal to honor [his] repeated invocation of his right to remain silent could only have conveyed to [him] the message that the officers were not going to stop until [he] gave in and told them what they wanted to hear. Second, the detectives['] repeated statements that [his] failure to back his brother's [(Thomas's)] play could only have conveyed to [Satterwhite] that he would harm his brother if he did not say what the detectives wanted him to say." This contention is unavailing.

We have already concluded the record establishes that Satterwhite did *not* invoke his right to remain silent after he waived his *Miranda* rights during the interview conducted by Detectives Encinas and Ramirez.

After independently reviewing the transcript of the interview, considering the various *Dykes* factors, we also conclude Thomas has failed to establish under the totality of the circumstances that his will was overborne such that his admissions must be deemed involuntary. The record shows the detectives repeatedly used Thomas's admissions as a basis for demonstrating their knowledge of Satterwhite's participation in the shooting incidents and to urge him to tell the truth. For example, early in the interview, after Satterwhite made his statement that "I ain't talking no more and we can leave it at that," one of the detectives said, "You want to listen to your brother's conversation? I'll let you listen to your brother's conversation. You think we're lying. You think we're trying to trick you. You want to listen to your brother?" Satterwhite replied, "Go ahead."

The record shows Satterwhite listened to a recording of Thomas's statements, a transcription of which is contained in the transcript of Satterwhite's own interview. Thomas's statements put Satterwhite in the backseat behind Thomas as Thomas was driving down Gribble Street. When Satterwhite finished listening to the recording, the detectives asked Satterwhite to "start all over," and tell them what happened. Although Satterwhite continued to deny any involvement in the incidents, he eventually made the various admissions discussed, *ante*.

Although Satterwhite, who was 15 years of age during the interview, was young, according to Dr. Friedman he was only mildly mentally retarded. The record shows he earned his high school diploma in 2007 while in custody. Like Thomas and the defendant in *Williams*, Satterwhite "effectively parried the [detectives'] accusations and questions" (*Williams, supra*, 49 Cal.4th at p. 442) until after he listened to the recording of Thomas's statement placing Satterwhite inside the Expedition on Gribble Street, and Satterwhite realized he had been caught lying to the detectives by claiming he was not present. In sum, the court did not err by denying Satterwhite's unmeritorious suppression motion.

III

*SATTERWHITE'S CRUEL AND/OR UNUSUAL*
*PUNISHMENT CLAIM*

Satterwhite claims his sentence of 196 years to life should be reversed, and the matter should be remanded for further proceedings, in light

of the United States Supreme Court's recent decision in *Miller, supra*, 567 U.S. ___ [132 S.Ct. 2455], which held that, in homicide cases, the prohibition of cruel and unusual punishment set forth in the Eighth Amendment to the federal Constitution prohibits the imposition of a *mandatory* sentence of life without the possibility of parole on a juvenile offender. (*Miller*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469]; see *People v. Caballero* (2012) 55 Cal.4th 262, 268, fn. 4 [145 Cal.Rptr.3d 286, 282 P.3d 291] (*Caballero*).)[8] We agree.

Citing *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1, 125 S.Ct. 1183] (*Roper*), and *Graham v. Florida* (2010) 560 U.S. 48 [176 L.Ed.2d 825, 130 S.Ct. 2011], the *Miller* court explained that, in homicide cases involving juvenile offenders, a sentencer is required "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469], fn. omitted.) Our high federal court elaborated, stating: "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." (*Id.* at p. ___ [132 S.Ct. at p. 2468].)

However, the *Miller* court also stated that, in homicide cases, it was "not foreclos[ing]" the ability of a sentencer to impose "this harshest possible penalty" of life without the possibility of parole on " 'the rare juvenile offender whose crime reflects irreparable corruption.' " (*Miller, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469], quoting *Roper, supra*, 543 U.S. at p. 573; see *Caballero, supra*, 55 Cal.4th at p. 268, fn. 4.)

Here, the court sentenced Satterwhite to an aggregate prison term of 196 years to life, consisting of 10 consecutive term-of-years sentences: 25 years to life for his count 1 conviction for the first degree murder of Smith, plus a mandatory consecutive term of 25 years to life for the count 1 gun enhancement (§ 12022.53, subd. (d) (hereafter § 12022.53(d)), for a total of 50 years to life as to count 1; plus a consecutive term of 25 years to life for his count

---

[8] In *Caballero*, the California Supreme Court stated, "We leave *Miller*'s application in the homicide context to a case that poses the issue." (*Caballero, supra*, 55 Cal.4th at p. 268, fn. 4.)

7 conviction for the first degree murder of Wilson, plus a consecutive term of 25 years to life for the count 7 gun enhancement (§ 12022.53(d)), for an additional and consecutive term of 50 years to life as to count 7; plus a consecutive term of seven years to life for his count 2 conviction for the attempted premeditated murder of Foster, plus a consecutive term of 25 years to life for the count 2 gun enhancement (§ 12022.53(d)); plus another consecutive term of seven years to life for his count 6 conviction for the attempted premeditated murder of Canty, plus a consecutive term of 25 years to life for the count 6 gun enhancement (§ 12022.53(d)); plus, finally, another consecutive term of seven years to life for his count 4 conviction for the attempted premeditated murder of Scott, plus a consecutive term of 25 years to life for the count 4 gun enhancement (§ 12022.53(d)).

Before the court imposed this sentence, Satterwhite's counsel argued that Satterwhite "was the least culpable," and urged that a sentence of 50 years to life "is enough." The prosecutor, pointing to evidence that Satterwhite made the self-incriminating statement that "I can't believe my brother is going down for something that I did," argued that Satterwhite was the one who shot (and killed) Smith during the Meadowbrook Drive incident. The prosecutor also argued that Satterwhite was "a 15-year-old, who, best case scenario from the defense perspective, [was] already developing a significant criminal history, [and was] hanging out with other 59 Brims, in a white Expedition going to rival territory on Gribble [Street], with multiple firearms." When the court characterized the behavior of Satterwhite and his cohorts as "hunting," the prosecutor agreed, stating, "Hunting. Make no mistake. That is what this case was all about." The prosecutor acknowledged Satterwhite's "low IQ," but pointed out that he and his family had moved out of Southeast San Diego into a nice home in the South Bay area, but he decided to go "back to that environment."

The court noted it could "either do consecutive or concurrent." The court then ruled it would impose consecutive sentences, stating: "I choose consecutive. [¶] And *it's not going to be an LWOP* [(i.e., a term of life without possibility of parole)] *because I'm prohibited to do that because of his age.* And I think that's the right thing to do. [¶] But there's no bright light at the end of the table [*sic*] for Mr. Satterwhite or Mr. Thomas on this. [S]o I intend to consecutive everything I can, except for [section] 654 prohibits [consecutive] sentences on several counts, which include [section] 246,[9] versus the attempt[ed] murders for the shootings in the cars. That will be [section] 654. But *I intend on running everything else consecutive.* That's my intent." (Italics added.)

---

[9] Satterwhite was convicted of two counts (counts 3 & 5) of shooting at an occupied motor vehicle in violation of section 246.

 As the foregoing excerpt indicates, the court incorrectly believed the aggregate sentence of 196 years to life it then imposed on Satterwhite was not a sentence of life without possibility of parole. The California Supreme Court recently made clear that such a sentence is the "functional equivalent of a life without parole sentence." (*Caballero, supra*, 55 Cal.4th at pp. 267–268). We note that our high state court decided *Caballero* in August 2012, more than two years after the court sentenced Satterwhite in June 2010.

The court's comment that Satterwhite's sentence was "not going to be an LWOP because I'm prohibited to do that because of his age," suggests the court incorrectly believed that a sentencing court in a homicide case involving a juvenile who was 15 years old at the time of the commission of his or her crimes can never impose a sentence of life without the possibility of parole. As already discussed, *Miller* clarified that a court, in the exercise of discretion as delineated in that case, may impose such a sentence on " 'the rare juvenile offender whose crime reflects irreparable corruption.' " (*Miller, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469].) We note that the court sentenced Satterwhite two years before the United States Supreme Court decided *Miller* in June 2012.

We are persuaded that Satterwhite's sentence of 196 years to life must be reversed and the matter remanded for resentencing in the exercise of the court's discretion in light of *Miller*. We express no opinion as to what sentence should be imposed in the exercise of that discretion.

IV

### *THOMAS'S AND SATTERWHITE'S REQUESTS FOR CORRECTION OF ERRORS IN THE SENTENCING MINUTES AND ABSTRACTS OF JUDGMENT*

#### A. *Thomas's Claims*

#### 1. *Sentencing errors*

Thomas claims that sentences for three enhancements of which he was acquitted were erroneously imposed and stayed, as reflected in the sentencing minutes and abstract of judgment, and should be stricken. The Attorney General acknowledges these errors and agrees they should be corrected. We conclude these errors should be corrected.

#### a. *Count 6: Section 12022.7, subdivision (a) enhancement*

Thomas first asserts that before his case was submitted to his jury, the prosecutor agreed the enhancement allegation attached to count 6 (attempted

murder of Canty) alleging he personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a), was not proved and should be dismissed under section 1118.1. Asserting the court did dismiss that allegation, Thomas asks that this enhancement be stricken and a corrected abstract of judgment be sent to the prison authorities.

The record shows that following its presentation of evidence, the prosecution consented to the dismissal under section 1118.1 of the count 6 allegation in question and the court so ordered. However, the allegation erroneously remained in the count 6 jury verdict form, and the jury found the allegation was not true.

Although the court correctly noted during sentencing that the jury did not make a count 6 true finding regarding infliction of great bodily injury, the June 4, 2010 sentencing minutes and Thomas's abstract of judgment (determinate) erroneously indicate the court stayed a sentence on a count 6 section 12022.7, subdivision (a) enhancement. The court must amend the sentencing minutes and the abstract of judgment to correct these errors.

 b. *Counts 2 and 3: Section 12022.53, subdivisions (d) and (e)(1)*
 *enhancements*

Thomas also asserts that similar errors were made with regard to the section 12022.53, subdivisions (d) and (e)(1) enhancement allegations attached to counts 2 (attempted murder of Foster) and 3 (shooting at an occupied motor vehicle), which alleged that Thomas was a principal in the crimes and at least one principal personally used a firearm and proximately caused great bodily injury or death to a person other than an accomplice.

Thomas correctly points out that the jury found these count 2 and count 3 allegations were not true, as reflected by the verdict forms and the reading of the verdicts. However, both the sentencing minutes and abstract of judgment (indeterminate) erroneously indicate the court stayed sentences for such enhancements. The court must amend the sentencing minutes and the abstract of judgment to correct these errors.

 2. *Victim restitution order*

Thomas also claims his abstract of judgment should be corrected to show Satterwhite is jointly and severally liable for victim restitution. The Attorney General agrees that Thomas is correct and the error should be corrected.

During sentencing, the court ordered that Thomas, Satterwhite, Myers, and Harris were jointly and severally liable for victim restitution as to count 1;

and Thomas, Satterwhite, and Myers were jointly and severally liable for victim restitution as to the remaining counts, counts 2 through 7.

Satterwhite's abstract of judgment (indeterminate) states in part: "RESTITUTION TO BE PAID JOINTLY AND SEVERALLY WITH CODEFENDANTS *EDWARD THOMAS*, IVORY HARRIS, AND ROBERT MYERS." (Italics added.)

However, as Thomas argues, that portion of Satterwhite's abstract of judgment was apparently copied and pasted into Thomas's abstract of judgment (indeterminate), which incorrectly states: "RESTITUTION TO BE PAID JOINTLY AND SEVERALLY WITH CODEFENDANTS *EDWARD THOMAS*, IVORY HARRIS, AND ROBERT MYERS." (Italics added.)

Thus, Thomas's abstract of judgment (indeterminate) erroneously lists Thomas himself, rather than Satterwhite, as a codefendant who is jointly and severally liable for restitution. This portion of Thomas's abstract of judgment should be amended to state: "RESTITUTION TO BE PAID JOINTLY AND SEVERALLY WITH CODEFENDANTS DEJON SATTERWHITE, IVORY HARRIS, AND ROBERT MYERS."

B. *Satterwhite's Claims*

Satterwhite claims the June 4, 2010 sentencing minute order and the abstract of the judgment against him must be corrected because (a) the minute order incorrectly indicates his sentence was a stipulated sentence and (b) the abstract incorrectly shows he was ordered to pay a $154 fine "PER GC2955001." These claims are moot because, for reasons already discussed, Satterwhite's sentence must be vacated and the matter remanded for resentencing.

## DISPOSITION

Thomas's count 6 sentence enhancement under Penal Code section 12022.7, subdivision (a) and his count 2 and count 3 sentence enhancements under Penal Code section 12022.53, subdivisions (d) and (e)(1) are stricken. As modified, Thomas's judgment is affirmed. The matter is remanded with directions to (1) correct the June 4, 2010 sentencing minutes and Thomas's abstract of judgment to reflect these modifications of the judgment; (2) delete the portion of page 2 of Thomas's abstract of judgment (indeterminate) that states "RESTITUTION TO BE PAID JOINTLY AND SEVERALLY WITH CODEFENDANTS EDWARD THOMAS, IVORY HARRIS, AND ROBERT MYERS" and replace that text with "RESTITUTION TO BE PAID JOINTLY AND SEVERALLY WITH CODEFENDANTS DEJON SATTERWHITE,

IVORY HARRIS, AND ROBERT MYERS"; and (3) forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

Satterwhite's convictions are affirmed, his sentence is vacated, and the matter is remanded for resentencing in light of *Miller, supra*, 567 U.S. ___ [132 S.Ct. 2455].

Aaron, J., and Irion, J., concurred.

A petition for a rehearing was denied January 8, 2013, and appellants' petitions for review by the Supreme Court were denied March 27, 2013, S208030.