Filed 3/7/13  P. v. Araujo CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B235844 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA063534) |
| v. | |
| IGNACIO ARAUJO, | |
| Defendant and Appellant. | |
| In re | B240501 |
| IGNACIO ARAUJO, | |
| on | |
| Habeas Corpus. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Susan Speer, Judge.  Sentence vacated and matter remanded; judgment is affirmed,

PETITION for Writ of Habeas Corpus.  Writ denied as moot.

Marcia C. Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and Louis W. Karlin, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Ignacio Araujo, appeals his conviction for first degree murder, premeditated attempted murder, and shooting at an inhabited dwelling, with firearm use and gang enhancement allegations (Pen. Code, §§ 187, 664/187, 246, 12022.53, 186.22, subd. (b)).[1] He has filed an accompanying petition for writ of habeas corpus. Araujo was sentenced to state prison for a term of 75 years to life plus life.

The sentence is vacated and the matter remanded to the trial court for resentencing; in all other respects the judgment is affirmed; the habeas corpus petition is denied as moot.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

On October 23, 2009,[2] Bryan A. lived in an apartment complex on Vanowen Street. Robert R. and Jose A. were friends of Bryan who lived nearby. That afternoon, Bryan, Jose and Robert were standing in front of the apartment complex when defendant Araujo appeared. Araujo walked up to Robert, pulled a gun from his sweatshirt, pointed it at Robert's head, and asked "Where you from?" When Robert replied, "Nowhere," Araujo said "M.S." and shot Robert in the face from just inches away. Robert fell and Jose started running. Araujo chased Jose and fired three times. One bullet shattered a front window of the apartment complex and landed in the patio. Robert died from his head wound.

Matthew Mowry, the dean of students at Birmingham High School, testified that in October 2009 there were problems at the school being caused by a gang

---

[1]     All further references are to the Penal Code unless otherwise specified.

[2]     All further date references are to the year 2009 unless otherwise specified.

rivalry between Mara Salvatrucha (M.S.) and Barrio Van Nuys ("B.V.N."). Mowry said "there always has been" trouble between B.V.N. and M.S.

Vaughn Gaboudian, an officer with the Los Angeles School Police Department, worked at Birmingham High School. He testified there had been on-going campus conflicts between M.S. and B.V.N. at the time of the shooting. Gaboudian was called to the scene of a fight on October 22 where he stopped Araujo, who was running away. Araujo said he belonged to M.S. and he had been having problems with B.V.N. members, but this had only been an argument, not a fight. The argument started because some B.V.N. members had "jumped him . . . near his apartment building." Araujo was told people from B.V.N. and another gang, 18th Street, "might get him after school" and that they would be "driving around looking for him." When Gaboudian asked if the school had to worry that M.S. would be looking for B.V.N. after school to retaliate, Araujo "said no, because he knows how it works. He said that if he gets into a fight with [the B.V.N. member with whom he had been arguing] . . . they would just be back in school two days later and that he would just blast him when he saw him."

Araujo's friend Jorge testified that a week before the shooting, Araujo had argued at school with Robert, who belonged to B.V.N. Robert insulted M.S. by saying, "Fuck Lamara." After the argument, Araujo asked to borrow Jorge's phone so he could call a friend in Pasadena in order to "feed the beast." Jorge understood this to be a death-related reference apparently aimed at Robert. After the shooting, Araujo told Jorge "he had killed one from Van Nuys." When Jorge said "that wasn't right," Araujo warned him not to say anything or Araujo would kill both Jorge and his mother.

Gang expert Ralph Brown testified B.V.N. and M.S. were rivals at the time of the shooting. When he was arrested, Araujo had various M.S. tattoos on his body, including a fairly recent Devil's Pitchfork tattoo on his arm. M.S. members do not get a Devil's Pitchfork tattoo unless they have committed a violent crime for the gang. By calling out a gang name while committing a crime, the perpetrator is

3

claiming it for the gang. Saying "Fuck Lamara" to an M.S. member would show disrespect and likely incite a violent reaction. "Feed the beast" is M.S. code for an act of violence. Based on a hypothetical question, Brown opined the attack on Robert and Jose had been committed to benefit the M.S. gang.

2. *Defense evidence.*

Araujo's mother testified that, in the period of time leading up to the shooting, Araujo had been very frightened. He told her he was being followed by other students who wanted to beat him up. About a month before the shooting, he began refusing to walk or take the bus home from school and she had to pick him up. Someone wrote "187" on her car several times and Araujo told her this was a death threat aimed at him.[3]

Araujo's girlfriend testified he was one of only two M.S. members at the high school and that students belonging to B.V.N. and other gangs hated him. She had seen death threat graffiti aimed at Araujo. On the day before the shooting, Araujo had argued with rival gang members, one of whom (not Robert) pulled a knife and threatened him. The girlfriend also testified her entire relationship with Araujo had been an elaborate ruse in order to "set him up" for an attack by rival gang members.[4]

Araujo testified in his own defense. He had joined M.S. when he was nine years old. If he left the gang he would be killed. He was one of only two M.S. members at the high school and there were at least ten B.V.N. members at school. They were threatening him and he lived in B.V.N. territory. He wanted to move, but his mother could not afford it. Death threats had been written on his mother's car and in graffiti in the neighborhood.

_____

[3]     Section 187 is the statute outlawing murder.

[4]     Araujo's girlfriend testified: ". . . I had to go out with him, get to know him better, and at last set him up with the people from the B.V.N. and B.B.S. [the Bad Boys gang] and with 18th Street. All three main gang members [*sic*] wanted to . . . get [Araujo]."

4

Jose was a member of the Bad Boys gang. Robert claimed the B.V.N. gang and was always in Jose's company. In the months leading up to the shooting, Araujo was becoming more frightened. About three weeks before the shooting, a car had slowed down next to him and someone inside pointed a gun at him: "They wanted to shoot but the bullet didn't come out." In the week before the shooting, Robert and Araujo traded gang insults. During the incident on October 22, Robert and Jose were among those trying to assault Araujo. He did not recall telling the school security officer "I'll just blast them when I see them," although it was possible he had said this.

Araujo testified that on the day of the shooting, the other M.S. member at school "came and he talked to me like frightened and he said they are looking for us." After school, some of Araujo's M.S. friends gave him a gun for protection. He was in a car with them when they gave him the gun. Then they kicked him out of the car and he started walking down Vanowen Street to a friend's house. Coincidentally, he had to go past Jose's apartment complex. As he was walking he saw Robert standing just 10 feet away. Araujo described the shooting:

"A. Well, I felt that if I turn around, they could see me and they could shoot at me.

"Q. And what happened next?

"A. Well, I saw that Jose saw me and I got frightened and I went towards where Robert was and I pulled out the gun.

"Q. And then what happened?

"A. I shot Robert.

"Q. And then did you shoot at Jose?

"A. Yeah, because I thought I saw he was going to grab something. He was near a car and I saw he was going to grab something and I was frightened."

5

Araujo acknowledged he received new gang tattoos after the shooting, but his friends had tattooed him without his permission while he was high on drugs. Araujo did not say anything to Jorge about "feeding the beast" or about having shot Robert; nor did he warn Jorge to remain silent.

Humberto Guizar, a gang expert, testified Mara Salvatrucha gang tattoos are worn to show pride in the group and are not earned by shooting someone. Before this trial, Guizar had never heard the term "feed the beast." In Guizar's opinion, Araujo shot Robert and Jose out of fear, not because he wanted to benefit his gang: "[H]e was under fire. He's basically an outcast in an area that is alien to him. He's not from this area. He's from . . . an M.S. gang that is primarily located . . . in the city of L.A., downtown. [¶] So once they knew that he was a gang member, they started to basically terrorize him in school every day." "The tagging on his car 187, saying that you are going to get killed, . . . you have to take that very serious when you are involved in a gang and somebody tells you that they are going to kill you and writing on your mother's car. [¶] He was jumped. [¶] Sadly, his own girlfriend was trying to set him up to get him killed. They were . . . trying to kill him. [¶] So when he shot, I believe that he was acting out of . . . fear . . . ."

## CONTENTION

Araujo's sentence constituted cruel and unusual punishment under the Eighth Amendment.

## DISCUSSION

Araujo contends his sentence of 75 years to life plus life violated the Eighth Amendment and that we should either modify it or remand to the trial court for resentencing. We conclude the appropriate course is to remand for resentencing so the trial court can give consideration to very recent Supreme Court case law regarding life terms for juveniles.

6

1. *The sentencing hearing.*

The prosecutor submitted a sentencing memorandum which argued for a term of 90 years to life. Defense counsel neither filed a sentencing memorandum nor offered any oral argument at sentencing.[5]

At the sentencing hearing, the trial court announced it had found numerous aggravating factors: "[T]he crime involved great violence, great bodily harm, threat of great bodily harm, and other acts disclosing a high degree of cruelty, viciousness and callousness. The defendant pre-planned his attack, arming himself with a handgun, obtaining the assistance of others, and arranged to be dropped off just a short distance away from where the victims resided. [¶] Without warning, the defendant walked up to the victim Robert . . . , fired into [his] face point blank, killing him where he stood." Araujo then shot at Jose "from behind as he ran for safety. [¶] The defendant fired multiple times at [Jose], firing through the front entrance of [his] apartment building. At least one bullet passed into the building endangering the lives of the residents living there."

The trial court said the victims were "particularly vulnerable. They were defenseless as they were attacked without warning and were unarmed. . . . [¶] The victims were only 15 years old at the time of this incident."[6] "The manner in which the crime was carried out indicates planning, sophistication, and professionalism. The defendant pre-planned the attack, presumably using other M.S. gang members,

---

[5]   In a declaration attached to Araujo's habeas corpus petition, his trial counsel states: "At the sentencing hearing, I believed the court had no discretion other than to impose the sentence it imposed. I did not object that a life sentence without a realistic possibility of parole was cruel and/or unusual for any juvenile or as to Mr. Araujo specifically and individually. I had no tactical reason for failing to object on those grounds. It never occurred to me to object on these grounds. I was unaware of *Roper v. Simmons, Graham v. Florida,* or the pending cases in the California Supreme Court and United States Supreme Court on the issue of life sentences as cruel/unusual punishment for juveniles."

[6]   Robert was 15; Jose was only 14.

7

to drive him to the scene of the attack armed with a loaded nine millimeter semi-automatic handgun. And after the murder the defendant was transported to Palmdale presumably by other M.S. gang members." "The defendant is an admitted M.S. gang member since the age of nine years old and was motivated to kill for the benefit of the gang after he was disrespected by the rival B.V.N. gang members at school. [¶] The defendant had additional M.S. tattoos applied to his body after the murder was committed."

The trial court found only one factor in mitigation: "The defendant has no known criminal record."

The trial court ended by saying: "The defendant has demonstrated a clear disregard for human life and demonstrated his intention to live his life as a proud, violent M.S. gang member. [¶] While this court is mindful that the defendant had a very difficult childhood, being born in El Salvador, losing his father at an early age, being jumped into the M.S. gang at the age of nine, and having his mother move to the United States without him, nevertheless the defendant had advantages and choices when he arrived in the United States and could have chosen to . . . leave the gang and lead a law-abiding life. He chose not to do so. [¶] And despite his tender age, the defendant is a vicious killer and a danger to society. [¶] For this, there can be no excuse, justification or sympathy."

The trial court then sentenced Araujo as follows. On count 1 (first degree murder): 25 years to life, plus 25 years to life for the firearm use enhancement (§ 12022.53(d)), with a minimum parole eligibility term of 15 years due to the gang enhancement (§ 186.22, subd. (b)). On count 2 (premeditated attempted murder): a consecutive term of life, plus 25 years to life for the firearm use enhancement. A sentence on count 4 (shooting at an inhabited dwelling) was stayed under the multiple punishment statute (§ 654). Araujo's total term was 75 years to life plus life.

2. *Discussion.*

Araujo was 16 years old at the time of the shooting. The United States Supreme Court has, in recent years, expressed concern about sentencing juvenile offenders to prison terms that prevent any possibility of rehabilitation and eventual release. In *Roper v. Simmons* (2005) 543 U.S. 551 [125 S.Ct. 1183, 161 L.Ed.2d 1], the court held that juveniles must be treated differently than adults when it comes to sentencing. "*Roper* established that because juveniles have lessened culpability they are less deserving of the most severe punishments. [Citation.] As compared to adults, juveniles have a ' "lack of maturity and an underdeveloped sense of responsibility" '; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' [Citation.] These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citation.] Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.'. . . [¶] No recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles. As petitioner's *amici* point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. . . . Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." (*Graham v. Florida* (2010) 130 S.Ct. 2011, 2026 [176 L.Ed.2d 825].

*Roper* held the imposition of capital punishment on juvenile offenders for any offense whatsoever violated the Eighth Amendment. *Graham* held the imposition of a life-without-possibility-of-parole sentence on a juvenile offender for a non-homicide offense violated the Eighth Amendment. *Miller v. Alabama* (2012) 132 S.Ct. 2455, 2469 [183 L.Ed.2d 407], held "the Eighth Amendment forbids a sentencing scheme that *mandates* life in prison without possibility of parole for

9

juvenile offenders," although a trial court could in its discretion impose such a punishment.  (Italics added.)

In *People v. Caballero* (2012) 55 Cal.4th 262, our Supreme Court concluded that, under the reasoning of these United States Supreme Court cases, "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*Id.* at p. 268.)  *Caballero* reasoned:  "*Miller* . . . made it clear that *Graham*'s 'flat ban' on life without parole sentences applies to all nonhomicide cases involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of a life without parole sentence imposed in this case.  [¶] Defendant in the present matter will become parole eligible over 100 years from now. [Citation.]  Consequently, he would have no opportunity to 'demonstrate growth and maturity' to try to secure his release, in contravention of *Graham*'s dictate. [Citations.]  *Graham*'s analysis does not focus on the precise sentence meted out. Instead . . . it holds that a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime. [Citation.]"  (*Id.* at pp. 267-268, fn. omitted.)

In reaching these conclusions, *Caballero* noted *Miller* had "extended *Graham*'s reasoning (but not its categorical ban) to homicide cases . . . ."  (*People v. Caballero, supra,* 55 Cal.4th at p. 267.)  *Caballero* pointed out *Miller* "also observed that 'none of what [*Graham*] said about children – about their distinctive (and transitory) mental traits and environmental vulnerabilities – is crime-specific. Those features are evident in the same way, and to the same degree, when . . . a botched robbery turns into a killing.  So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses.'  [Citation.]"  (*Ibid*.)

Araujo was sentenced on September 7, 2011, before either *Miller* (decided June 25, 2012) or *Caballero* (decided August 16, 2012) was decided. The trial court's explanation for imposing the functional equivalent of a life-without-possibility-of-parole term was almost entirely taken up with an enumeration of the aggravating factors warranting a long sentence. The court made no more than a passing reference to Araujo's juvenile status when it said, "And despite his tender age, the defendant is a vicious killer and a danger to society." This record does not demonstrate the trial court gave meaningful consideration to the factors subsequently discussed in *Miller* and *Cabalerro*. Undoubtedly, the trial court had discretion to impose a sentence that amounted to life without possibility of parole, but it could not do without discussing the special factors trial courts are now required to consider.

Given these circumstances, we believe the proper course is to vacate Araujo's sentence and remand to the trial court for resentencing in accordance with the new case law from the United States Supreme Court and the California Supreme Court. (See *People v. Thomas* (2012) 211 Cal.App.4th 987, 1013-1015 [juvenile defendant's sentence of 196 years to life, for special circumstances murder and attempted murder, reversed and remanded for resentencing because it predated *Miller* and *Caballero*]; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1480-1482 [juvenile defendant's minimum aggregate sentence of 100 years, for murder and multiple attempted murders, reversed and remanded for resentencing because it predated *Miller* and *Caballero*].)

We express no opinion as to how the trial court show weigh the factors discussed in *Miller* and *Caballero*, or as to how long Araujo's sentence should be.[7]

---

[7]     Araujo's habeas corpus petition raised the same Eighth Amendment issues within the context of an ineffective assistance of counsel claim. Since we have directly reached the same issues by addressing the merits of Araujo's appeal, we will deny the habeas corpus petition as moot.

11

## DISPOSITION

Araujo's sentence is vacated and the matter remanded to the trial court for resentencing in light of the Eighth Amendment and the *Miller* and *Caballero* cases, and consistent with this opinion. In all other respects, the judgment is affirmed. The habeas corpus petition is denied as moot.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

ALDRICH, J.

12