Filed 7/30/21  P. v. Ruiz CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>IVAN ALEXIS RUIZ,<br><br>Defendant and Appellant. | F078436<br><br>(Super. Ct. No. BF172278A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Robert C. Nash and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Ivan Alexis Ruiz was charged with the first degree murder of Michael Ballesteros (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (a)). The information further alleged that defendant intentionally killed the victim by means of lying in wait (§ 190.2, subd. (a)(15)); personally and intentionally discharged a firearm and caused the victim's death (§ 12022.53, subd. (d)); and was 16 years of age or older at the time of the offense (Welf. & Inst. Code, § 707). Following trial, the jury found him guilty as charged and found true the special allegations alleged pursuant to sections 189, 190.2, subdivision (a)(15), and 12022.53, subdivision (d). Defendant was sentenced to life without the possibility of parole plus 25 years to life for the firearm enhancement. The abstract of judgment reflects that a $300 parole revocation fine (§ 1202.45) was imposed and suspended.

On appeal, defendant makes numerous contentions. First, any inculpatory statements that he made during custodial interrogation should have been excluded from evidence because he did not waive his *Miranda*[2] rights. Second, in view of *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), the case should be remanded to give him the opportunity to make a record of information relevant to a future youth offender parole hearing. In the alternative, he argues that his attorney rendered ineffective assistance by failing to request a *Franklin* proceeding. Third, in view of section 12022.53, subdivision (h), the case should be remanded to give the trial court the opportunity to decide whether to strike the firearm enhancement. In the alternative, defendant argues that his attorney rendered ineffective assistance by failing to ask the court to strike the enhancement. Finally, defendant asserts that the $300 parole revocation fine should be stricken because, although the abstract of judgment reflects such a fine, the court did not

---

[1]     Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436.

impose one and, if it had, his sentence precludes parole eligibility.  The Attorney General agrees that this fine should be stricken.

We conclude:  defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights; a *Franklin* remand is not required because defendant had an adequate opportunity to request a *Franklin* proceeding below but failed to do so; a remand for resentencing is unnecessary because the record does not affirmatively establish the trial court was unaware of its discretion to strike the firearm enhancement; and the parole revocation fine must be stricken.  Additionally, we reject defendant's claims of ineffective assistance of counsel.

## STATEMENT OF FACTS[3]

### I.     The victim

On February 9, 2017, at or around 2:30 p.m., a farm laborer discovered Ballesteros's body in an orange orchard on the east side of Bakersfield.  At the crime scene, law enforcement found steel shot, two bullets, and two spent shell casings with the headstamp "Sig .40 S&W."  According to Detective Meyer, the lead detective, "it appeared as if someone was in a hurry trying to clean up the shell casings and wasn't able to capture all of them and maybe got spooked off and then fled the scene."

An autopsy was performed on February 14, 2017.  There were 10 gunshot wounds, seven of which were deemed lethal.  Two in the forehead displayed "considerable tearing of the skin," indicating that the gun barrel had been pressed against the entry sites at the moment of discharge.  On the other hand, lethal wounds in the left nostril, left shoulder blade, right chest, upper back, and middle back showed "no signs of gunpowder stippling or soot" and little "tearing around the hole," indicating that the associated bullets were fired more than 18 inches away.  There were two "borderline lethal" "flesh wounds" in

---

[3]     Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names and last initials to protect personal privacy interests.  No disrespect is intended.

3.

the buttocks and a "deep graze wound" in the right palm. The forensic pathologist concluded that the cause of death was "[m]ultiple gunshot wounds" and the manner of death was "medical homicide," but he could not definitively establish the order in which the shots were fired.

## II. Johnny M.

Johnny lived with his girlfriend, his girlfriend's mother, his girlfriend's sister, and defendant at a residence in Bakersfield since February 2016. At some point thereafter, Johnny befriended Ballesteros.

Starting in January 2017, Ballesteros stayed overnight at defendant and Johnny's home nearly every day, and usually carried a backpack containing extra clothes and toiletries. One day, Ballesteros brought a gun to the house and showed it to defendant and Johnny. Defendant offered to buy it for $160. The next day, he gave Ballesteros a $60 deposit and promised to pay the remaining balance later. After Ballesteros left with the firearm, defendant informed Johnny that he was "gonna kill [Ballesteros]" because "he didn't want to pay him the rest of the money." Johnny thought that defendant was joking and called him "retarded" and "stupid."

On February 9, 2017, Johnny was at work when he received a message from Ballesteros to "go shoot the guns." Johnny replied, "I'm at work, hold on." After Johnny's shift ended at or around 2:00 p.m., he went home and told defendant about Ballesteros's message. Defendant responded, "Yeah, I'll go." Johnny's girlfriend, who was also present, did not want Johnny to participate, so he did not go. Defendant retrieved ammunition from his room, loaded some magazines, and went to pick up Ballesteros. He left in Johnny's girlfriend's mother's green Toyota Corolla. About "an hour and 30 minutes to two hours" later, defendant returned with Ballesteros's backpack. Johnny asked, "Where's Michael?" Defendant "laughed" and "said he killed him." Johnny initially thought that defendant was joking, but he changed his mind when he saw a "breaking news alert" on television about "a dead body by the orchard fields." Johnny

4.

passed by defendant's room and saw him putting a black .40-caliber Springfield XD subcompact pistol into a lockbox. Eventually, Johnny asked, "How did you do it?" Defendant said that he and Ballesteros were "target practicing" when "he told Mike to fix the targets." While Ballesteros was facing away from him, defendant "emptied the whole clip in him."

Approximately five days later, Johnny told defendant that he would "throw the gun away." Although defendant "was angry," Johnny took defendant's lockbox containing the pistol and hid it in the trunk of the Corolla. After two days elapsed, Johnny drove to a friend's house, contacted law enforcement, and handed over the lockbox.

### III.  Bridgett S.

On February 9, 2017, Bridgett was at home with Ballesteros, her boyfriend. At or around 1:00 p.m., Ballesteros left. He had told Bridgett that "Johnny was picking him up" and he would "be back in a bit." Roughly two hours later, Bridgett texted Ballesteros, but he did not respond. That night, she repeatedly texted and called him, but he still did not respond. The next morning, between 4:00 a.m. and 5:00 a.m., Bridgett sent a message to Johnny inquiring as to Ballesteros's whereabouts, but Johnny did not respond. At or around 7:50 a.m., she visited defendant and Johnny's residence. Defendant answered the door. Bridgett "asked him where Mike was." Defendant, who was "[c]alm," said he "didn't know" and asked her if she "wanted to get Mike's stuff." Bridgett declined, stated that she "would be back later," and went to school. After school ended, she made repeated attempts to contact Ballesteros, but to no avail. Bridgett returned to defendant and Johnny's residence. This time, Johnny answered the door. Bridgett, who was "angry and frustrated," questioned why Johnny "didn't know where Mike was when he was the last one to pick him up" and demanded "all [of Ballesteros's] stuff." Johnny, who "seemed flustered and frustrated," gave her Ballesteros's backpack.

5.

When Bridgett arrived at her home, she received a call from Ballesteros's mother telling her that Ballesteros was dead.

Two days later, a vigil was held for Ballesteros. Bridgett recalled that Johnny attended, but defendant "wasn't there" and she "was confused [as] to why he wasn't."

## IV. The pistol

Bridgett's uncle owned the black .40-caliber Springfield XD subcompact pistol. He had reported that someone stole it.

Ballistics analysis was performed on the pistol and the two shell casings found at the crime scene. A criminalist test-fired the pistol to generate "known exemplars." Following a "microscopic comparison" between the exemplars and the recovered casings, the criminalist opined that the "two spent cartridge cases were fired by the submitted firearm."

## DISCUSSION

## I. Defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights.

a. *Background*

i. Custodial interrogation

Meyer and his partner Detective Garcia questioned defendant on February 21, 2017.[4] The following colloquy took place at the outset:

"DETECTIVE MEYER:  Okay. I need to get some information, uh, from you real quick, but before I do, I'm gonna read some information to you, okay?

"[DEFENDANT]:  Yes, sir.

"DETECTIVE MEYER:  Are you ready?

"[DEFENDANT]:  Yes.

---

[4]  The jury listened to an audio recording of the interrogation.

"DETECTIVE MEYER:    Uh, you have the right to remain silent.  You understand?  I need you to say your answer.

"[DEFENDANT]:    Uh, yes.

"DETECTIVE MEYER:    Ye—yeah?

"[DEFENDANT]:    Yes.

"DETECTIVE MEYER:    Okay.  Anything you say may be used against you in court.  Do you understand?

"[DEFENDANT]:    Yes, sir.

"DETECTIVE MEYER:    You have the right to the presence of an attorney before and during any questioning.  Do you understand?

"[DEFENDANT]:    Yes, sir.

"DETECTIVE MEYER:    If you cannot afford an attorney, one will be appointed to you free of charge before any questioning if you want.  Do you understand?

"[DEFENDANT]:    Yes, sir."

Defendant initially stated that he last saw Ballesteros leaving his and Johnny's home sometime between 1:00 and 2:00 p.m. on February 9, 2017.  He suggested that Ballesteros may have been killed by someone named Daniel after a "gun deal" "went wrong."  After Garcia remarked that the evidence "point[ed] in [defendant's] direction," defendant said that he gave Ballesteros a ride in the Corolla between 1:00 and 2:00 p.m. to an apartment complex near the intersection of Pioneer Drive and Fairfax Road to " 'handle business with' " Daniel.  At the time, Ballesteros had a pair of firearms in his possession.  After Garcia mentioned that there were tire tracks at the orange orchard that belonged to the Corolla, defendant explained that he drove Ballesteros to meet Daniel at a nearby park and then followed Daniel's truck to the orchard.  Daniel was accompanied by a second male.  Ballesteros intended to sell the firearms for $400 and promised to give defendant $150 "for giving him a ride out there."  At the orchard, defendant stayed in the

7.

car while Ballesteros conducted the transaction "far away." Sometime later, he heard multiple gunshots. Defendant then drove towards someone wearing "a gray hoodie." He could not tell whether this person was Daniel or Daniel's companion. Defendant left the orchard and "didn't tell nobody" because he "was scared." He insisted that he did not kill Ballesteros.

Meyer and Garcia questioned defendant again on February 22, 2017.[5] The following colloquy took place at the outset:

> "DETECTIVE MEYER: . . . [B]efore we talk to you again, I'll read this information – that same thing – information I read to you last night, okay? Um, you have the right to remain silent, you understand?
>
> "[DEFENDANT]: Yes, sir.
>
> "DETECTIVE MEYER: Anything you say may be used against you in court, you understand?
>
> "[DEFENDANT]: Yes, sir.
>
> "DETECTIVE MEYER: You have the right to the presence of an attorney before and during any questioning, you understand?
>
> "[DEFENDANT]: Yes, sir.
>
> "DETECTIVE MEYER: If you cannot afford an attorney, one will be appointed to you free of charge before any questioning if you want. Do you understand?
>
> "[DEFENDANT]: Yes, sir."

Meyer asked defendant if he was willing to take a polygraph test. Defendant answered, "Yeah." Thereafter, the polygraph examiner entered the room. The following colloquy transpired:

---

[5] The jury listened to an audio recording of the interrogation.

"[EXAMINER]: A couple things I wanna explain to you, okay? I cannot force you to take it. You have to volunteer to take it, all right? So you volunteer to take it?

"[DEFENDANT]: Uh, well, with the presence of an attorney just in case, like, then, but I – I know I'm gonna pass, sir, I just, you know, I just want an attorney just in case, like, I – I just – I know nothing happened. I – I just – but I just wanna have one, like, but I – I'm – I'm all for it for the polygraph, sir.

"DETECTIVE GARCIA: I'm – I'm gonna to tell you right now, once an attorney shows up, he's not gonna let – let you take it.

"[EXAMINER]: Yeah.

"DETECTIVE GARCIA: I'm – I'm gonna tell you that right now.

"DETECTIVE MEYER: We – we typically don't have attorneys inside the polygraph room. The only people that can be in the room – or the polygraph room would be, um, the examiner and then maybe myself or my partner, um, it – like I said, it's totally voluntari – voluntary. If you wanna do it, you're – you can do it. We can do it for you today, um, and then if you decide you don't wanna do it, then you don't have to do it.

"[DEFENDANT]: All right.

"DETECTIVE MEYER: It's up to you. I mean, if you – if you tell us the truth, um, and you wanna give an examination, then it's something we can offer you.

"[DEFENDANT]: Yeah.

"[EXAMINER]: So would you like to do it?

"[DEFENDANT]: Well, like I said, with the presence of an attorney.

9.

"[EXAMINER]:           Okay. Like he explained to you, um, if you're gonna – if you say you want an attorney, then I – then you can talk to an attorney. I am not gonna allow the attorney to be in the room with you.

"[DEFENDANT]:         Yes, sir.

"[EXAMINER]:          Do you understand that?

"[DEFENDANT]:         Yeah.

"[EXAMINER]:          So are you telling me you would like to talk to an attorney . . .

"[DEFENDANT]:         I just wanna speak . . .

"[EXAMINER]:          . . . first? Or . . .

"[DEFENDANT]:         Yeah, I just wanna speak to an attorney, like, you know, I'll, you know, just in case, like, anything, like, nothing's gonna pop up, but, like . . .

"DETECTIVE GARCIA:   Well, an attorney's not gonna stop what you gotta say.

"[DEFENDANT]:         Yeah, I know.

"DETECTIVE GARCIA:   Okay?

"[DEFENDANT]:         Uh . . .

"DETECTIVE GARCIA:   The only thing he's gonna tell you is not to take the exam and that's just from my experience from doing this for a while . . .

"[DEFENDANT]:         Yes.

"DETECTIVE GARCIA:   . . . okay? And just to let you know, once that happens, if you're innocent and you say that nothing's gonna come up on this test, we won't know because you won't take the test.

"[DEFENDANT]:         Yeah.

10.

"DETECTIVE GARCIA:  We're not forcing you to, we're telling you that this is gonna happen just from the experience that we've had with attorneys and (unintelligible).

"[DEFENDANT]:  Yeah.

"[EXAMINER]:  And if you didn't do – if you take the test and you didn't do it, we're gonna know you didn't do it.  But at the same time, if you did it, we're gonna know you did it.

"[DEFENDANT]:  Yes, but I, you know, I didn't do it, it's just like I said . . .  [¶] . . . [¶] . . . but I just want a presence of an attorney . . .

"DETECTIVE MEYER:  Okay.

"[DEFENDANT]:  . . . just to – just to be safe.

"DETECTIVE MEYER:  So let me confirm this so we don't – so we don't take this interview any farther, okay?  So I'm trying to confirm right now if – do you wanna talk to us about this case or do you want an attorney present before you talk to us to find out more information about the case, or . . .

"[DEFENDANT]:  Yes, I'm just – I just wanna feel more comfortable, like, knowing, you know . . .

"DETECTIVE GARCIA:  Oh, you . . .

"[DEFENDANT]:  . . . with an attorney.  Uh, if everything's okay . . .

"DETECTIVE GARCIA:  . . . but, here – here – I'm a little confused right here . . .

"[DEFENDANT]:  Yeah.

"DETECTIVE GARCIA:  . . . because you're asking for an attorney to be present during the polygraph.

"[DEFENDANT]:  No, I'm not.  I just wanna speak to one, like, right now, like . . .

11.

"DETECTIVE GARCIA:    Okay.

"[DEFENDANT]:    . . . I just wanna . . .

"[EXAMINER]:    You wanna speak to an attorney before you take a polygraph, is that what . . .

"[DEFENDANT]:    Yes.

"[EXAMINER]:    . . . you're saying?

"[DEFENDANT]:    Yeah, just wanna speak to, you know, an attorney.

"DETECTIVE GARCIA:    Then you're done, (Brad).

"[EXAMINER]:    Okay.

"DETECTIVE MEYER:    Yeah.

"DETECTIVE GARCIA:    Yeah, (Brad)'s done.

"DETECTIVE MEYER:    Okay.  Okay.  So . . .

"DETECTIVE GARCIA:    All right.

"DETECTIVE MEYER:    Thank you, buddy."

After the polygraph examiner left the room, the following colloquy transpired:

"DETECTIVE GARCIA:    . . .  We won't do a polygraph after this.  That was it, okay?

"[DEFENDANT]:    Okay.

"DETECTIVE GARCIA:    Now that you – now that he's gone, are you still willing to talk to us further about this investigation?

"[DEFENDANT]:    Yes, sir.

"DETECTIVE GARCIA:    Okay.

"DETECTIVE MEYER:    Okay.  Um . . .

"[DEFENDANT]:    Whatever you guys wanna know . . . ."

12.

Defendant maintained that he drove Ballesteros to the orange orchard to meet Daniel and subsequently heard gunshots. He added that he was "really high" "off weed" at the time. The detectives noted that defendant had been "the last one with [Ballesteros] when he was killed" and in possession of the murder weapon, which was given to law enforcement by Johnny. Defendant then claimed that Ballesteros was actually shot by someone else—a "white smoker"—while test-firing the guns at the orchard. When the detectives accused defendant of lying and asked him why he shot Ballesteros, defendant eventually said, "It was an accident, man." He specified that he was asked by Ballesteros to hang up a banner for target practice. Defendant complied. When he turned around, however, Ballesteros was pointing one of the guns at him. Defendant punched him and cried, " 'Dude, what the fuck?' " Ballesteros answered, " 'I'm gonna kill you bitch.' " He fired a shot, which missed, and defendant scrambled to find the other gun. Ballesteros fired a second shot, which again missed. When defendant retrieved the other gun, he shot Ballesteros multiple times "with [his] eyes closed." Afterward, defendant "threw that gun in the car" and left. At home, he told Johnny what had happened. When Johnny advised him to "throw that shit away," defendant replied, " 'Man, take it. I do not want it.' "

ii.  Hearing

Defense counsel filed a motion in limine to "exclude any reference to or evidence of defendant's alleged statements" or, in the alternative, "conduct a hearing pursuant to the provisions of Evidence Code [section] 402 to evaluate the admissibility of any alleged statements." (Boldface & some capitalization omitted.) The trial court granted the request for a hearing. At the hearing, Meyer testified that the first day of questioning lasted approximately three hours while the second day lasted "a couple hours." During questioning, defendant was not handcuffed and was offered water. Meyer was aware that defendant was two months short of 18 years of age back then. He acknowledged that he did not expressly ask defendant if he was willing to waive his *Miranda* rights.

13.

After listening to additional arguments by the parties, the court took a brief recess to review the audio recordings and transcripts of the interrogation. Thereafter, the court pronounced:

> "It appears to the Court, based on the transcripts, as well as the testimony that was received this morning, that the defendant was provided his Miranda rights or his Miranda advisal as required by Miranda vs. Arizona. [¶] . . . [¶]
>
> "Express waivers, as counsel certainly is aware, are not required in order to find that the Miranda advisal was properly administered and the rights were knowingly, intelligently, and voluntarily waived; thereafter, participation in a conversation by way of an interrogation is valid.
>
> "Implied waivers occur more often than not and for strategic purposes, at least in this Court's view, and in this case, as it relates to the first interview, there was no express waiver of rights, but there was an implied waiver given the defendant's engagement in that interrogation.
>
> "For purposes of determining the knowingly, intelligently, and voluntarily waiving those Miranda rights, the Court has considered the totality of the circumstances, including the defendant's juvenile age, as well as the surrounding circumstances, as testified to this morning. Those include not only the duration and time of that initial interview, but also the recollection that perhaps food might not have been provided, but water, if not provided, was certainly available to the defendant.
>
> "It further appears that the defendant was escorted to the interview room on both occasions restrained, and those restraints were removed from the defendant so as to make him a bit more comfortable during that engagement.
>
> "Considering the totality of the circumstances, it appears that the defendant, therefore, did intelligently, knowingly, and voluntarily waive his rights and thereafter participated in an approximate three-hour interview with law enforcement. [¶] . . . [¶]
>
> ". . . [F]or the second interview the Miranda advisal was read again and the defendant responded affirmatively to understanding those rights, and shortly thereafter an implied waiver was obtained by the defendant's participation in that interview.

14.

"For purposes of a Miranda advisal being rendered under the totality of the circumstances, the Court does find that even in the second interview the Miranda advisal was appropriately provided and the defendant knowingly, intelligently, and voluntarily waived his rights.

"The crux of the second interview, however, does stem when the defendant made utterances about an attorney being present during the polygraph examination.

"To a certain extent, as counsel is aware, polygraph examinations are not admissible in court, but can be utilized by law enforcement perhaps even as a ruse to get cooperation from the suspect interviewed, and in this particular case the Court doesn't know if a polygraph examination actually would have occurred or would not have occurred, but it appears to have been a strategy that law enforcement implemented in an attempt to get further or additional information out of the defendant.

"Be that as it may, that is the circumstances under which the defendant's request to have an attorney present or to speak to an attorney before taking that polygraph examination, and when it comes to an invocation of an individual's right to have an attorney, that certainly would qualify as an invocation to have an attorney during or immediately before the polygraph examination is conducted.

"Once the polygraph examination – once the determination for the polygraph examination to not occur was done, there did leave an ambiguity about the defendant's request for an attorney. [¶] . . . [¶]

"It does appear that when the defendant made the utterance about an attorney that his utterance in and of itself was ambiguous, that would require thereafter clarification by law enforcement to understand exactly what the defendant was requesting; specifically, whether the defendant wanted an attorney for all purposes or whether the defendant wanted an attorney for the limited purpose of the polygraph examination. That ambiguity did lead to clarifying questions by law enforcement, which was, in this Court's view, fully explained [in the transcript]. [¶] . . . [¶]

"Once the polygraph examiner was released from the room, a clarifying question was asked by Detective Garcia, quote, now that he's gone, are you still willing to talk to us further about this investigation, and the response was yes, sir, unquote.

"There was a further utterance by the defendant which states, quote, whatever you guys wanna know, . . . unquote . . . .

15.

"This was an appropriate time for law enforcement to clarify what the defendant was actually requesting, and it appears to the Court that the defendant's request to speak to an attorney or have an attorney was a conditional request involving the polygraph examination that was offered voluntarily and it was not an unconditional request to stop or cease any further questions by way of an interrogation absent the polygraph examination.

"The Court has considered these issues under the totality of the circumstances, which likewise includes, for purposes of review, the defendant's age as a juvenile. While juveniles do enjoy certain rights when it comes to Miranda advisals, the determination of whether an advisal is properly given and whether a waiver is obtained is identical to the individual being an adult versus a juvenile with certain factors that must be considered. Certainly age is one of them. Additionally, low IQ is another, as well as other factors that are substantially similar, and in this particular case the only factor that the Court has been offered is that the defendant was two months shy of his eighteenth birthday when this interrogation occurred.

"Nonetheless, the Court has considered his juvenile status. . . . [I]t appears to the Court, based on a review of those portions in the transcript and the evidence, that no course of tactics were taken by law enforcement to force the defendant to participate in these interviews, nor has there been any inclination that the defendant did not participate knowingly, voluntarily, or intelligently after waiving his Miranda rights.

"For those reasons, . . . the Court is going to allow the People to present these interviews with the defendant if they choose to do so in their case-in-chief."

b. *Analysis*

" 'Under the Fifth Amendment to the federal Constitution, as applied to the states through the Fourteenth Amendment, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." [Citation.] "In order to combat [the] pressures [of custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights" to remain silent and to have the assistance of counsel. [Citation.] "[I]f the accused indicates in any manner that he wishes to remain silent or to consult an attorney,

16.

interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial" [citation], at least during the prosecution's case-in-chief [citations].' [Citation.] 'Critically, however, a suspect can waive these rights.' [Citation.] To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary. [Citations.]" (*People v. Nelson* (2012) 53 Cal.4th 367, 374-375 (*Nelson*); see *People v. Lewis* (2001) 26 Cal.4th 334, 383 ["A minor has a Fifth Amendment privilege against self-incrimination, which precludes admission of a minor's confession obtained without the minor's voluntary, intelligent, and knowledgeable waiver of his or her constitutional rights."].)

"The test for validity is as follows. 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.' [Citation.]" (*People v. Molano* (2019) 7 Cal.5th 620, 648 (*Molano*); see *People v. Cruz* (2008) 44 Cal.4th 636, 667 ["A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision."].)

"Determining the validity of a *Miranda* rights waiver requires 'an evaluation of the defendant's state of mind' [citation] and 'inquiry into all the circumstances surrounding the interrogation' [citation]. When a juvenile's waiver is at issue, consideration must be given to factors such as 'the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of

waiving those rights.' [Citations.]" (*Nelson, supra*, 53 Cal.4th at p. 375.) "[E]ven when a juvenile has made a valid waiver of the *Miranda* rights, a court may consider whether the juvenile gave a confession after being ' "exposed to any form of coercion, threats, or promises of any kind, [or] trickery or intimidation . . . ." ' [Citation.]" (*Id.* at p. 379, fn. omitted.)

" 'On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence.' [Citation.] The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review. [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1176-1177 (*Linton*).)

Here, at the outset of the interrogation on February 21, 2017, Meyer advised defendant of his *Miranda* rights. Defendant confirmed that he understood his rights. Although he was not formally asked to waive them, "[i]t is well settled that law enforcement officers are not required to obtain an express waiver of a suspect's *Miranda* rights prior to a custodial interview and that a valid waiver of such rights may be implied from the defendant's words and actions." (*People v. Parker* (2017) 2 Cal.5th 1184, 1216 (*Parker*).) The record establishes that defendant "proceeded to actively participate in the conversation with the detectives . . . ." (*Ibid.*) "While defendant did not expressly waive his *Miranda* rights, he did so implicitly by willingly answering questions after acknowledging that he understood those rights." (*People v. Lessie* (2010) 47 Cal.4th 1152, 1169 (*Lessie*); accord, *Nelson, supra*, 53 Cal.4th at p. 375; see *People v. Cruz, supra*, 44 Cal.4th at p. 667 ["A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights."].) In addition, "[t]here is no suggestion the detectives resorted to physical or psychological pressure to coerce defendant to talk to them." (*Parker, supra*, at p. 1216.)

18.

Likewise, at the outset of the interrogation on February 22, 2017, defendant was advised of his *Miranda* rights, confirmed that he understood his rights, and implicitly waived them by freely conversing with the detectives. (See *Lessie*, *supra*, 47 Cal.4th at p. 1169.) He initially appeared to consent to a polygraph test. When the examiner entered the room and asked whether this consent was voluntary, defendant expressed that he wanted to speak to an attorney beforehand. Subsequently, the examiner was dismissed. Garcia then asked, "[N]ow that [the examiner]'s gone, are you still willing to talk to us further about this investigation?" Defendant unequivocally answered, "Yes, sir." He added, "Whatever you guys wanna know . . . ."

"If, postwaiver, a defendant requests counsel, the officers must cease further questioning until a lawyer has been made available or the defendant reinitiates." (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 19; accord, *Molano*, *supra*, 7 Cal.5th at p. 654.) " 'An accused "initiates" ' further communication, when his words or conduct 'can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation." ' [Citations.]" (*Molano*, *supra*, at p. 656.)

While defendant invoked the right to counsel before the polygraph test could be administered, once it became clear that the test would not be administered, defendant clarified that he still wanted to talk about the criminal investigation. (See *Nelson*, *supra*, 53 Cal.4th at p. 382 ["Where . . . the suspect makes a conditional invocation of counsel limited to the administration of a polygraph test, officers need not terminate the entire interrogation."].) Again, "[t]here is no suggestion the detectives resorted to physical or psychological pressure to coerce defendant to talk to them." (*Parker*, *supra*, 2 Cal.5th at p. 1216.)

On appeal, defendant contends that "age, immaturity, lack of any proof of contact with the criminal justice system, and minimal education weighed strongly against finding an implied waiver and the voluntariness of his statements . . . ." He emphasizes that he

"was 17 years old at the time of the interrogation," "had minimal education, completing tenth grade without graduating from high school," "had no skills," and "worked doing field labor." He alleges that "there is no evidence of any sustained juvenile petitions."

In our view, defendant's age, purported immaturity, education level, and history as a manual laborer did not automatically invalidate the *Miranda* waiver. (See *Lessie*, *supra*, 47 Cal.4th at p. 1169; *People v. Lewis* (2001) 26 Cal.4th 334, 384; *In re Brian W.* (1981) 125 Cal.App.3d 590, 602-603; *In re Norman H.* (1976) 64 Cal.App.3d 997, 1002.) Even assuming, arguendo, that defendant had no prior experience with the criminal justice system, a lack of criminal history is but one factor to consider. Over the course of the questioning, defendant comprehended the detectives' questions and answered coherently, many times in great detail. On several occasions, when the detectives noted inconsistencies in his accounts (see *People v. Enraca* (2012) 53 Cal.4th 735, 755), defendant "was keen enough to change his story . . . ." (*People v. Lewis*, *supra*, 26 Cal.4th at p. 384.) Defendant did not exhibit any signs of confusion or other mental problems. On the second day of questioning, defendant conditionally invoked his right to counsel and then reinitiated communication. He was questioned for approximately three hours on the first day and "a couple hours" on the second day, which "hardly reflect the kind of continuous, prolonged interrogation that has been found to render a resulting confession involuntary." (*Linton*, *supra*, 56 Cal.4th at p. 1178.) He was also uncuffed and offered water. (See *People v. Thomas* (2012) 211 Cal.App.4th 987, 1011 [removal of handcuffs and offer of water militated against finding that the defendant's will was overborne].) "There is no indication here of coercive tactics by the individuals interviewing defendant, including any evidence that they exploited any personal characteristics of defendant in order to obtain his admissions and confession." (*Linton*, *supra*, at p. 1179.)

In view of the totality of the circumstances, we conclude defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights.

20.

**II.    A *Franklin* remand is not required because defendant had an adequate opportunity to request a *Franklin* proceeding below but failed to do so.**

Generally, a person who was sentenced to a lengthy prison term for an offense committed when he or she was age 25 or younger is entitled to a youth offender parole hearing.  (See § 3051; *Franklin*, *supra*, 63 Cal.4th at pp. 277-278.)  When assessing a prisoner's suitability for parole, the parole board is required to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner . . . ."  (§ 4801, subd. (c); see § 3051, subd. (f)(1).)

In *Franklin*, the California Supreme Court reasoned that sections 3051 and 4801 "contemplate that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the [parole board]'s consideration. . . .  Assembling . . . statements 'about the individual before the crime' is typically a task more easily done at or near the time of the juvenile's offense rather than decades later . . . ."  (*Franklin*, *supra*, 63 Cal.4th at pp. 283-284.)  The state high court concluded that Franklin, who was 16 years old when he committed murder and was sentenced before the enactment of these statutes (see *id.* at p. 268), may not have had an adequate opportunity at sentencing "to make a record of mitigating evidence tied to his youth" (*id.* at p. 269).  Accordingly, it remanded the matter for a limited purpose:  to permit the trial court to determine "whether Franklin was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing."  (*Id.* at p. 284.)  If Franklin did not have this opportunity, the trial court was empowered to receive pertinent evidence and information from both parties, with "[t]he goal of any such proceeding [being] to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the [parole board], years later, may properly discharge its obligation to 'give great weight to' youth-related factors [citation]

21.

in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime 'while he was a child in the eyes of the law' [citation]." (*Ibid*.)

On appeal, defendant contends that he is entitled to the same relief that our Supreme Court granted in *Franklin* because his attorney "did not place on the record all the mitigating evidence that could be relevant at [his] eventual youth offender parole hearing," e.g., "[his] level of maturity, cognitive ability, or other youth-related factors." We disagree.

"Section 3051 was amended effective January 1, 2016, to require youth offender parole hearings for offenders who were 25 years old or younger at the time of the controlling offense. [Citation.] The Supreme Court decided *Franklin* in May 2016." (*People v. Medrano* (2019) 40 Cal.App.5th 961, 967 (*Medrano*).) Defendant, who was 17 years of age at the time of the murder, was sentenced on November 6, 2018, nearly three years after *Franklin* was handed down. "[U]nlike the defendant in *Franklin*, defendant had both the opportunity and incentive to put information on the record related to a future youth offender parole hearing." (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1088-1089, italics added.) "The record does not indicate that [his] opportunity to [request a *Franklin* proceeding] was inadequate in any respect. Rather, it appears that he merely failed—whether by choice or by inadvertence—to exercise it." (*Medrano*, *supra*, at p. 967.) Therefore, "there is no basis for a *Franklin* remand here." (*People v. Woods*, *supra*, at p. 1089.)[6]

Alternatively, defendant contends that his attorney rendered ineffective assistance of counsel by failing to request a *Franklin* proceeding below. "In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her

---

[6]    Defendant cites *People v. Tran* (2018) 20 Cal.App.5th 561, which is inapposite. In that case, the offender had been sentenced before *Franklin* was decided (see *id.* at p. 568) and "did not have the benefit of that decision at the time of his sentencing" (*id.* at p. 570).

counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*), citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.) "To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness . . . under prevailing professional norms." ' " ' [Citation.] To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. [Citations.]" (*Mickel*, *supra*, at p. 198.)

"[C]ertain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding." (*Mickel*, *supra*, 2 Cal.5th at p. 198.) "The record on appeal may not explain why counsel chose to act as he or she did. Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*Ibid*.) "Moreover, we begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' [Citation.] Accordingly, [the California Supreme Court] ha[s] characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission. [Citation.]" (*Ibid*.)

The record before us does not reveal why defense counsel did not request a *Franklin* proceeding. Absent any affirmative evidence that there was no rational tactical purpose for counsel's forbearance, "it would be inappropriate for us to address defendant's ineffectiveness claim on direct appeal." (*Mickel*, *supra*, 2 Cal.5th at p. 200.) While defendant maintains that "[t]here can be no tactical basis for counsel's failure to

23.

request a *Franklin* hearing," there could have been a legitimate reason. As our Supreme Court has observed, some offenders may choose "to forgo a *Franklin* proceeding altogether" since "[d]elving into the past is not always beneficial to a defendant." (*In re Cook* (2019) 7 Cal.5th 439, 459.)

Furthermore, although we find no basis for a *Franklin* remand, defendant is not foreclosed from seeking a *Franklin* proceeding. Our Supreme Court has held that a youthful offender whose conviction and sentence are final may file a motion under section 1203.01 to make a record of youth-related mitigating evidence. (*In re Cook*, *supra*, 7 Cal.5th at pp. 446-447; accord, *Medrano*, *supra*, 40 Cal.App.5th at p. 968.) Because defendant can still pursue a *Franklin* proceeding, he would not be able to demonstrate prejudice arising from his attorney's purported deficient performance.

## III. A remand for resentencing is unnecessary because the record does not affirmatively establish that the trial court was unaware of its discretion to strike the firearm discharge enhancement.

"[A]ny person who, in the commission of a [murder], personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (§ 12022.53, subd. (d).) As of January 1, 2018, subdivision (h) of section 12022.53 provides:

> "The court may, in the interest of justice pursuant to [s]ection 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (Stats. 2017, ch. 682, § 2.)

On appeal, defendant contends that "the trial court did not give any consideration to [section 12022.53, subdivision (h)]." The record shows that he was sentenced on November 6, 2018, over 10 months after the amended section 12022.53, subdivision (h) became effective. "[I]n light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, we cannot

24.

presume error where the record does not establish on its face that the trial court misunderstood the scope of that discretion." (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.) Since defendant does not cite anything in the record showing otherwise, we reject his claim of error.

Alternatively, defendant contends that his attorney rendered ineffective assistance of counsel by failing to ask the court to strike the firearm enhancement. As we discussed, "certain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding" (*Mickel*, *supra*, 2 Cal.5th at p. 198) since "a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission" (*ibid*.). The record before us does not reveal why defense counsel did not make the request. Absent any affirmative evidence that there was no rational tactical purpose for counsel's forbearance, "it would be inappropriate for us to address defendant's ineffectiveness claim on direct appeal." (*Id.* at p. 200.)

Defendant maintains that "[t]here can be no tactical basis for counsel's failure to request . . . the court to exercise its discretion to consider striking a 25 year to life sentence on a criminal defendant who committed an offense at 17 years of age and was already looking at a sentence of life without the possibility of parole." We disagree. At the sentencing hearing, the court—which acknowledged defendant's "youthfulness" as a potential circumstance in mitigation—nevertheless remarked that life without parole was "the appropriate sentence" in view of the "plethora of [aggravating] circumstances": (1) the crime "certainly involved great violence" "above and beyond what would otherwise result in murder, by way of the numerous shots that were fired and impacted on [the victim]"; (2) defendant used a firearm during the commission of the crime; (3) the victim "was placed in a position of vulnerability"; (4) "[t]he manner in which th[e] crime was carried out certainly did indicate and pose a level of sophistication and planning

25.

beyond what is necessary to commit an otherwise murder"; and (5) defendant "took advantage of a position of trust" "when committing this crime under the guise that [defendant and the victim] were merely going target shooting." It is at least plausible that defense counsel could have concluded that a request to strike the firearm enhancement would have been fruitless. (See *People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile."], superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161-1165.)

## IV. The $300 parole revocation fine must be stricken.

"In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." (§ 1202.45, subd. (a).) "A parole revocation fine may not be imposed for a term of life in prison without possibility of parole, as the statute is expressly inapplicable where there is no period of parole." (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.) Additionally, when there is a discrepancy between the oral pronouncement of judgment and the abstract of judgment, the oral pronouncement controls. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)

On appeal, defendant correctly points out that the court did not impose a $300 parole revocation fine; nevertheless, one is reflected in his abstract of judgment. He also correctly notes that such a fine may not be imposed when the sentence precludes parole. We will strike the parole revocation fine and order correction of the abstract of judgment.

### DISPOSITION

The parole revocation restitution fine imposed pursuant to section 1202.45 is stricken. The trial court is directed to prepare an amended abstract of judgment deleting that fine and send a certified copy thereof to the appropriate authorities. In all other

26.

respects, the judgment is affirmed without prejudice to defendant's filing a motion for a *Franklin* proceeding under the authority of section 1203.01 and *In re Cook*, *supra*, 7 Cal.5th 439.

DETJEN, Acting P.J.

WE CONCUR:


FRANSON, J.


SMITH, J.